## DAVIS v. SENECA FALLS MFG. CO., Inc.

(District Court, W. D. New York. October 21, 1925.)

**1. Corporations ⬤⇒469—No power to issue bonds as security for past indebtedness.**

Under Stock Corporation Law N. Y. § 55, re-enacted by Laws 1923, c. 787, § 69, inhibiting issuance of bonds by a corporation except for money, labor done, or property actually received for its use and lawful purposes, it has no power to issue and pledge them for its pre-existing debt for a loan not induced by promise to give them as security.

**2. Corporations ⬤⇒474—Creditor to whom corporation delivers its bonds as security for pre-existing debt, not holder for value.**

Creditors to whom corporation, in violation of Stock Corporation Law N. Y. § 55, as re-enacted by Laws 1923, c. 787, § 69, delivers its bonds as security for pre-existing debts, are not holders for value.

**3. Corporations ⬤⇒474—Power to pledge bonds for antecedent debts held not conferred by resolutions of stockholders or directors.**

Power of corporation to pledge bonds for antecedent debts was not conferred by resolution of stockholders authorizing bond issue for raising money, nor by directors' subsequent resolution authorizing the officers to make promissory notes and ratifying loans already made.

**4. Corporations ⬤⇒547(4)—Creditors may attack validity of bonds, especially where receivers take a neutral attitude.**

Creditors of a corporation may attack validity of its bonds, especially where receivers to wind up its affairs and their counsel take a neutral attitude.

**5. Corporations ⬤⇒545(1)—Sale of bonds to wife of officer of insolvent corporation held illegal as a plan to give him preference.**

Sale by corporation, insolvency of which was imminent as evidenced by its refusal to pay its debts, of its bonds to an officer's wife, the proceeds being used to pay its debts to him, held an illegal preference to him, forbidden by Stock Corporation Law N. Y. § 15; she not being a purchaser for value, having reason to believe insolvency imminent, and that the plan was to prefer him.

**6. Corporations ⬤⇒537—Test of insolvency stated.**

The test of insolvency of a corporation is not whether its assets exceed liabilities, but a general inability to pay its debts when they become due in the regular course of business.

**7. Corporations ⬤⇒544(1)—Sale of bonds of insolvent corporation to third person held illegal preference of bank.**

Sale of bonds of insolvent corporation under arrangement between its officers and its creditor bank that the proceeds should be used to pay the bank, as they were, held, under the facts, a circuitous preference, the purchaser merely acting for the bank, and borrowing from

it the price, and giving it his note with the bonds as security.

**8. Judgment ⬤⇒768(1)—Not a lien where not docketed in county of real estate till after appointment of receivers and enjoining of actions.**

Judgment against corporation, previously and elsewhere obtained, did not become a lien on the corporation's real estate, not being docketed in the county where the real estate was situate till the day after that on which the court, in suit to conserve corporation's assets and wind up its affairs, appointed receivers for it, and enjoined pending actions and procedure, and this though bond of receivers was not approved till later date.

**9. Receivers ⬤⇒86—Right to possess assets dates from appointment.**

Right of receivers to possess themselves of the assets dates from their appointment, though their bond is not approved till later.

**10. Courts ⬤⇒508(3)—Statute against injunction staying proceeding in state court held not contravened by order of federal court on appointing receivers.**

Order of federal court on appointing receivers for corporation to wind up its affairs, restraining pending actions or procedure, relative to judgment previously obtained in another county, but not docketed, till after such appointment and order, where corporation's property was situate, held not to contravene Rev. St. § 720 (Comp. St. § 1242), prohibiting the granting of injunction by federal court to stay proceedings in a state court.

In Equity. Suit by Evan Davis against the Seneca Falls Manufacturing Company, Inc. On exceptions to report of special master. Report modified.

George J. Skivington, of Rochester, N. Y., and Carl E. Dorr, of Syracuse, N. Y., for receivers.

Shearman & Sterling, of New York City (John N. Regan, of New York City, of counsel), for National City Bank of New York.

Merrill, Rogers, Gifford & Woody, of New York City (C. Lansing Hays, of New York City, of counsel), for Irving Bank-Columbia Trust Co.

Webster, Meade & Straus, of Rochester, N. Y., for Ruth M. Adams.

Costello, Cooney & Fearon, of Syracuse, N. Y., for Martin G. Grossman.

James M. E. O'Grady, of Rochester, N. Y., for Merchants' Bank of Rochester.

HAZEL, District Judge. The Seneca Falls Manufacturing Company, Inc., was organized under the laws of the state of New York, and on November 22, 1922, receivers in equity to conserve the assets of the company and wind up its affairs were appoint-

ed by this court on complaint and answer admitting the allegations of the bill. Afterwards, on application of the receivers, the assets of the defendant were sold for $150,000, and the sale was later approved by this court. Thereupon a special master was appointed to take proof of claims of creditors and of the lien of a trust mortgage on the real estate held by the City Bank Trust Company of Syracuse (hereinafter for short called the City Bank), dated June 6, 1921, against the proceeds of the sale of defendant's plant and properties in the custody of the receivers. The trust mortgage was given as collateral security for an issue of certified coupon bonds amounting to $250,000. Bonds amounting to $30,500, were retained by the City Bank, and the balance delivered to defendant, which sold some and made deposits of others as collateral security for its promissory notes. The claims filed on behalf of the bondholders included the claims of the National City Bank of New York, Irving Bank-Columbia Trust Co. (hereinafter called Irving Bank), F. Herbert Brown, and Merchants' Bank of Rochester. The validity of these bonds was disputed by other bondholders.

It is shown that the defendant gave its promissory demand note to the National City Bank on March 22, 1921, for $65,000, which amount was subsequently reduced by payments to $49,600. To secure the balance due, defendant on August 30, 1921, voluntarily delivered 51 of its bonds, secured by the trust mortgage, as collateral security for the payment of the outstanding note, with the understanding that as payments were made bonds equal to the amount paid, would be returned. On August 21, 1921, defendant owed the Irving Bank $24,000 on its overdue promissory demand notes, and, to secure their payment, 14 coupon bonds in various amounts were delivered as collateral to the pre-existing notes, and bonds were also delivered to F. Herbert Brown amounting to $5,000, to Merchants' Bank amounting to $84,900, and to Ogden R. Adams, as collateral security on notes for loans and advances made, amounting to $10,100. On August 17, 1921, the Adams note was discounted by the Merchants' Bank and the bonds deposited with it as collateral security. On the same day Ruth M. Adams, wife of said Ogden R. Adams who was president of defendant company, claims to have bought the bonds which were collateral to her husband's note, and that she then became the owner thereof. Defendant was also indebted to the City Bank on notes amounting to $28,600, and bonds were deposited with it as collateral security for their payment, which thereafter were sold to one Grossman.

The special master found that the coupon bonds held by the National City Bank, the Irving Bank, and those bonds pledged to the Merchants' Bank on the Brown loan were all delivered to secure pre-existing indebtednesses and were not issued for money actually received, or for labor or property, and accordingly were invalid under section 69 (formerly section 55) of the Stock Corporation law of this state (Consol. Laws, c. 59, as re-enacted by Laws 1923, c. 787), and their rights to participate in the proceeds were that of unsecured creditors only; while the bonds transferred by defendant to Mrs. Adams, Grossman, and Standing, concededly acting for the Merchants' Bank, and various bonds owned by others totaling $145,700, were legal and valid liens on the fund.

The National City Bank and Irving Bank filed exceptions to the special master's report, each contending, first, that the bonds delivered to them were valid and subsisting obligations; and, secondly, that, if they were invalid under the doctrine of In re Progressive Wall Paper Corp., 229 F. 489, 143 C. C. A. 557, L. R. A. 1916E, 563, then the bonds deposited with the City Bank and afterwards transferred to Grossman, the Adams bonds, and the bonds transferred to Standing, were likewise invalid under the provisions of section 15 of the state Stock Corporation Law.

The questions involved are important, and have been carefully considered.

[1-3] 1. Extended discussion with relation to the asserted validity of the bonds held by the two New York banks is unnecessary, since the Progressive Wall Paper Corp. Case, supra, fully and clearly states the law in this circuit appertaining thereto. That deliveries were for pre-existing indebtednesses existing for about two years is undisputed. That they were not delivered for money, labor done, or property actually received at the time by defendant is practically conceded. The local law and its construction by the courts of this state applies. Section 69 (section 55) of the Stock Corporation Law, which was considered by Chief Judge Rogers in the Progressive Wall Paper Corp. Case, supra, provides as follows:

"Sec. 69. *Consideration for Issue of Stock and Bonds.* No corporation shall issue either shares of stock or bonds, except for money, labor done or property actually received for the use and lawful purposes of such corporation."

The construction given the essential word-

ing of the statute by the Circuit Court of Appeals for this circuit was that a corporation was without power to issue and pledge its stock, property, or bonds merely for a pre-existing debt. Extension of time of payment or surrender of old notes and giving renewals with the same or different indorsers is not a compliance with the statute. But counsel argue that the learned court misapplied the law, and that its decision was primarily based upon interpretation of similar statutes by courts of other states. This view of the construction of the quoted provision is untenable. On examining the state decisions relating to section 55, the Circuit Court of Appeals was of the opinion that such decisions failed to meet the facts presented in the case before it, and accordingly resort was had, to aid in construction, to decisions of other states where a like statute existed; and the conclusion reached was that, under settled law, bank creditors and individual creditors of a corporation accepting bonds as collateral security for pre-existing debts are not holders for value, and that such bonds are not entitled to the protection of bonds for money, property, or labor done.

Persons who take industrial bonds as security for money previously borrowed do so at their risk and in the light of the statute which forbids pledging them except for value received at the time. The bonds deposited, in the instant case, with the New York banks were, in my opinion, illegally delivered, and, in possessing them, the banks were not holders for a good and valuable consideration. They were not shown to have even been deposited pursuant to any agreement extending the time of payment or that they were pledged in contemplation of future indebtednesses as was the case in Westinghouse, etc., v. Brooklyn Rapid Transit Co. (D. C.) 288 F. 221. Indeed, the loans were made solely upon the naked credit of the defendant. The stockholders' resolution, in evidence, authorizing a bond issue for raising money, did not confer authority to pledge any for antecedent debts; nor does the directors' resolution, subsequently passed, authorizing the officers to make promissory notes and ratifying loans already made, confer such power. The indebtednesses were not induced by giving bonds or promising to give bonds as collateral security, and accordingly no equitable title to the deposited bonds, in my opinion, was imparted by the transaction.

2. The testimony of Mr. Hancock who was attorney for the trust mortgagee and its president, points out that he had a conversation with Mr. Adams as early as March 22, 1922, relating to defendant's financial affairs and the raising of additional working capital. New directors had been elected in place of others who, Adams said, were responsible for the impaired condition of the company by taking money to which they were not entitled, and there were troubles with the New York bank over its loans. He was authorized to interview creditors with a view of raising funds on a second trust mortgage to meet existing obligations, and, in interviews with the vice president of the National City Bank and with an official of Irving Bank and with Mr. McPhail of the Merchants' Bank, he tried to enlist their co-operation. It was intended by defendant's directors to construct cheaper lathes than the more expensive ones it had been making, and which were no longer marketable. Subscriptions for stock and bonds were procured to carry out this purpose. The New York banks appointed a committee to consider the proposal to extend payment of their loans for three years, and a modification to one year was suggested with the right to extend the loans at the end of the first year or liquidate defendant's affairs. Hancock declined to assent to this suggestion, asserting that additional capital had already been subscribed under an understanding of a three-year extension. Subsequently he was informed that the New York banks had concluded not to grant any extension; that they wanted their money; that demands for payment had been made; that the National City Bank had the personal guaranty of the Merchants' Bank and Mr. McPhail for payment of its notes. Both McPhail and Adams were informed of this decision by the New York banks. The pendings activities for raising capital were discontinued, since it was thought idle to proceed further with the plan. Thereafter, on August 9, 1922, a special meeting of the board of directors of defendant was held which was presided over by Adams, and at which Mr. Hancock was present. The president announced at the meeting that the New York banks had refused to grant any further extensions upon their notes and had demanded immediate payment; he also stated that Grossman had offered to buy $29,000 par value of the defendant's first mortgage bonds; that McPhail had telegraphed that he had an offer from a man to purchase $85,000 of defendant's bonds at their par value, on condition that the proceeds be used to pay the overdue notes and that the bonds would be turned over to the purchaser; also that Brown and

Adams had notified the treasurer that, under existing circumstances, they would buy the bonds held by them as collateral on their notes, or procure purchasers for them, upon condition that the moneys apply on their notes. The various offers were accepted by the directors as the minutes of the meeting show, and bonds deposited with the City Bank were transferred or sold to Grossman, bonds held by the Merchants' Bank to Standing (an employee), and the F. Herbert Brown bonds to the Merchants' Bank, while those in the possession of Adams were sold to his wife, and in each instance the proceeds of the sales were used to pay the various notes.

3. The evidence satisfactorily shows that the parties understood that the New York banks had called their loans, and that the main purpose of the special directors' meeting was to determine how the bond-holding creditors might "change their position from unsecured creditors to secured creditors." Creditors concededly were pressing for payment, and, according to Adams receivership was imminent. Of the five directors present, Adams, a creditor and president of defendant, and Wallace and Beeler, stockholders, were also directors of the City Bank.

4. The evidence shows that Mr. McPhail who had been a director of defendant, was fully informed of the attitude of the New York banks, and moreover that the validity of the various collateral bonds held on pre-existing indebtednesses was questionable. The defendant at this time either was insolvent, or its insolvency was imminent; and the evidence shows that the parties to these various transactions were aware of the financial stress of the defendant.

[4-6] The objecting creditors have the right to attack the bonds for invalidity, especially as the receivers and their counsel have taken a neutral attitude. The sale of the Adams bonds to his wife, who with the proceeds paid defendant's debt to her husband, was in my opinion illegal and forbidden by section 15 of the Stock Corporation law, which reads as follows:

"No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash. No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid. * * * Every person receiving by means of any such prohibited act or deed any property of a corporation shall be bound to account therefor to its creditors or stockholders or other trustees."

The testimony of Mrs. Adams shows that she had reason to believe that insolvency was imminent, and that the plan was to create a preference. She was put upon reasonable inquiry, and was required to make investigation before buying the bonds or permitting their transfer to her. It seems to me that the plan by which the note was paid and the bonds transferred constituted an indirect payment of her husband's debt and consequently a preference to him.

Transfers of bonds of a corporation to an officer, director, or stockholder in payment of an individual debt is illegal when the corporation is insolvent, or its insolvency is imminent. The imminence of insolvency herein is evidenced by defendant's refusal to pay its debts, and the facts and circumstances fairly establish an intention to give a preference. The transfer of the bonds to Mrs. Adams and their deposit as collateral to the payment of her note to the Merchants' Bank does not, in view of her omission to make reasonable inquiry, constitute her a purchaser for value. It is evidenced that her husband swore that he has personally paid the interest on her note which supplied the money to pay her husband, and this supports the contention that the transfer of the bonds was for and on account of her husband. It is contended that she acted in good faith and believed the defendant to be solvent; that the subsequent insolvency should not be given weight, since the value of the assets was believed to be double the value of the bonds, and the buildings alone had been appraised at $250,000. The circumstances, however, suggest an obvious overvaluation. It was wholly immaterial whether the assets exceeded or were less than the liabilities, for the test of insolvency was a general inability to pay its debts when they became due in the regular course of business. Abrams v. Manhattan Consumers' Brewing Co., 142 App. Div. 392, 126 N. Y. S. 844; Joseph v. Raff, 82 App. Div. 47, 81 N. Y. S. 546, affirmed 176 N. Y. 611, 68 N. E. 1118. It is difficult

to conceive how the action of the board of directors on August 9, 1922, together with that of the Merchants' Bank, the City Bank, Mrs. Adams, and Grossman can be viewed in any other light than a plan by which preferences would be given and received by them.

[7] Grossman bought the bonds in the possession of the City Bank at Mr. Hancock's request. He had not, he testified, previously intended buying them, although on the day before the purchase the directors of defendant accepted an offer on his account. He paid for the bonds at the bank with a counter check, and borrowed the price from the bank, giving his note and leaving the bonds as collateral security.

The claim of the objecting creditors that he acted for the City Bank is, I think, fairly inferable from the facts and circumstances, and, as said by the Supreme Court in National Bank v. National Herkimer Bank, 225 U. S. 178, 32 S. Ct. 633, 56 L. Ed. 1042, "Circuity of arrangement will not avail to save it," or does not make legal that which is illegal. His purchase was also illegal, since he was a stockholder of defendant and presumably knew of its financial condition and that insolvency was imminent. He was put upon notice, and, if he had inquired, he no doubt would have learned that a preference inured to the City Bank by the transaction. Walters v. Zimmerman (D. C.) 208 F. 62.

5. The transaction by which Standing bought bonds for the Merchants' Bank is subject to a similar determination. The latter was the real party in interest. The sale to Standing was procured by Mr. McPhail and in my judgment was with the purpose of securing a preference as a holder of valid bonds.

6. It is also claimed that the transfers of bonds were illegal in view of the control exercised by the president of defendant, assisted by two directors, who were also directors of the City Bank, but, in view of the foregoing, this contention need not be passed upon.

[8, 9] 7. The judgment recovered against defendant by the National City Bank on its note on November 1, 1922, and recorded on that date in the clerk's office of the county of New York, was not a lien, in my opinion, upon defendant's real estate situated in Seneca county at the time of the appointment of the receivers herein. It cannot be regarded as a preferred lien upon the fund in their custody, or upon the amount realized on the sale of the realty. If the judgment claim were allowed, the National City Bank would receive a preference over other unsecured creditors, thereby defeating the object of this action. Jurisdiction herein was acquired on November 2, 1922, and the receivers were appointed on the day before the judgment was docketed in Seneca county, and moreover the injunction restraining prosecution of pending actions was in force. Counsel for the New York banks concede that the judgment recorded on November 1st in New York did not become a lien on defendant's real estate at such time. The contention that the filing of the transcript and docketing the same in Seneca county on November 3d, the day following the appointment of receivers, created a prior lien, is not sustained.

In deciding this point, we must have in mind the nature of this action and the purpose in appointing equitable receivers. The general rule is that no judgment lien against the real estate can be acquired subsequent to the time when the assets come into the possession of the court. It is true that the right to acquire a lien existed, but the bank nevertheless could not, in view of the restraining order, proceed and gain a preference over other creditors. Had the transcript been filed on an earlier date, a different question would be presented, since the right of the receivers to possess themselves of the assets real and personal dates from the time of their appointment. See 34 Cyc. 199 and 231, and cases cited. That bond of the receivers had not been approved by the court until a later date is immaterial. Horn v. Pere Marquette (C. C.) 151 F. 626, 639. It has frequently been held that, when a court of equity takes into its custody the property of an insolvent with the view of administering the same for the benefit of the creditors and others interested, an equitable attachment of the property exists, and, though strictly speaking the title is not in the receiver, it nevertheless, as the adjudications hold, is in the creditors for whose benefit the assets are held by the court. Thompson v. Phenix Ins. Co., 136 U. S. 287, 10 S. Ct. 1019, 34 L. Ed. 408; Henning v. Raymond, 35 Minn. 303, 29 N. W. 132.

[10] 8. The injunction order of the court restraining pending actions or procedure does not contravene section 720 of the Revised Statutes (Comp. St. § 1242), and the case of Bortman v. Urban (C. C. A.) 4 F. (2d) 913, cited by counsel for the bank, is distinguishable. In that case the judgment was recovered and docketed in the county where defendant had its real property before the appointment of receivers who, as the court held, came into possession subject

to the existence of the judgment. This court having first acquired jurisdiction of the res, it must carry out the purposes of the action. The claim of the National City Bank, therefore, to payment of its judgment following the payment of valid bonds, is disallowed.

10. The special master's report as to the validity of the liens in controversy must be modified in conformity with the view expressed herein. Ordered to be entered on five days' notice to interested parties. So ordered.