## WOODBURY v. PICKERING LUMBER CO.
### No. 1657.

District Court, W. D. Missouri, W. D.
Feb. 11, 1933.

See, also, 1 F. Supp. 92.

Ellison A. Neel, Charles P. Woodbury, and Phineas Rosenberg, all of Kansas City, Mo., for plaintiff.

Henry N. Ess, of Kansas City, Mo., for bondholders' committee.

W. C. Michaels and Jesse Andrews, both of Kansas City, Mo., for receiver.

Herman M. Langworthy, of Kansas City, Mo., Samuel Mitchell, of St. Louis, Mo., and Judge James E. Goodrich, of Kansas City, Mo., for intervener banks.

Rees Turpin and Chester Smith, both of Kansas City, Mo., representing certain unsecured creditors.

REEVES, District Judge.

On May 9, 1931, upon plaintiff's bill and the answer of the defendant, Mr. George R. Hicks was appointed receiver of the defendant company. The plaintiff was a secured bondholder, but the defendant by answer admitted the necessity for the appointment of a receiver to take charge of all its property. Such appointment appeared to be necessary to protect legitimate private interests. The parties joined in recommending the receiver named.

The case does not fall within the condemnation of Michigan v. Michigan Trust Co., 286 U. S. 334, loc. cit. 345, 52 S. Ct. 512, 76 L. Ed. 1136, nor Harkin v. Brundage, 276 U. S. 36, 48 S. Ct. 268, 72 L. Ed. 457. In fact, the propriety of the appointment has scarcely been challenged by any interested party.

Following said appointment, the plaintiff filed an application or supplemental bill for instructions to the receiver with respect to a subsidiary corporation formed and becoming operative July 1, 1930. All the stock of said subsidiary was owned by the defendant and concededly it was incorporated to meet the financial embarrassment of the defendant, which acutely existed in April, May, and June of 1930.

The plaintiff asserted in his application that the said subsidiary was but an agency and an instrumentality of the defendant and that its formation and operation had worked inequitably among creditors. He asked that the corporate form be disregarded. The court heard the application and, in view of the extensive inquiry involved, deemed it proper to order a reference. Accordingly, Cyrus Crane, Esquire, a member of the Kansas City Missouri Bar, was appointed special master to take testimony, make findings of fact and conclusions of law, and report these to the court with recommendations. This has been done in an able manner.

Numerous exceptions have been filed to the findings of fact and conclusions of law reported by the special master. These exceptions all pertain to the one central fact as to whether the formation and operation of the subsidiary under the circumstances constituted it a mere agency and instrumentality of the defendant.

The special master properly found upon the evidence in relation to the financial condition of defendant that in April, 1930, its "ratio of quick assets to current liabilities had declined below the ordinarily required banking ratio of two to one, and that a 'congestion of maturities' falling due within the next few months made it necessary to give immediate consideration to plans for the re-establishment and maintenance of a satisfactory credit situation and the payment of current obligations which could not be refinanced," and that "in view of its unsatisfactory current position and in view of general financial conditions, it was apparent that the Pickering Lumber Company could not have obtained additional funds either by further borrowings on the open market or by loans from banks other than those to which it was then indebted."

At that time the assets of the defendant were carried at $38,353,696.68. Its liabili-

ties were determined to be $14,327,084.33. There was an apparent net worth of $24,026,612.35. Of its liabilities $10,900,253.19 consisted of long term obligations, secured in part by a first mortgage and in part by purchase-money liens. The current assets of the company amounted to $5,795,981.90. Its current liabilities were fixed at $3,324,865.24.

With respect to its then situation, the special master further said: "The current position of the Company had been substantially impaired and had fallen below the ratio of two to one, during the preceding eight or ten months by reason principally of (a) marked decrease in the volume of sales and decline in price of its products, (b) large capital expenditures out of income in connection with the construction of the lumber mill at Alturas, California, and (c) heavy payments in connection with the purchase of the properties coming under the so-called timber purchase contracts."

Among other current obligations of the defendant were short-term bank loans aggregating $1,700,000, also open market paper shortly maturing in the sum of $850,000. A like amount was also maturing on timber purchase contracts.

But a short time previously, Mr. Hicks, now the receiver, had been impressed into the service of the company as president to succeed Mr. W. A. Pickering, who had deceased after a brief illness on April 15, 1930. Mr. Hicks had no interest in the company and only agreed to accept such responsibility upon assurances of banking co-operation.

It was obvious from the evidence, and the master substantially so found, that notwithstanding the large excess of assets over liabilities the company was unable to meet its current obligations without a rehabilitation of its credit structure. This fact was recognized by the officers and the creditor banks holding short-time notes. On April 30–May 1, 1930, a conference was held at Kansas City between the then officers of the defendant and creditor banks. Such conference was held because of the necessity "for the re-establishment and maintenance of a satisfactory credit situation and the payment of current obligations which could not' be refinanced." At that conference a plan was evolved to satisfy the maturities of the timber purchase contracts in the aggregate sum of $850,000 by the simple ex-

pedient of obtaining indulgence from the vendors.

It was then proposed to organize the subsidiary corporation mentioned for the establishment of credit and the payment of current obligations. The stock of the new company was to be wholly owned and held by the defendant. The directors were to be named by the defendant. A large portion of the free and unencumbered assets of the defendant was to be transferred to the new corporation. On its part the new corporation was to assume the bank indebtedness of $1,700,000, and also $200,000, concurrently to be advanced by George H. Burr & Co., for the immediate retirement of an equal amount of open market short-term paper.

The balance of the open market paper was to be taken up from the proceeds of a loan to be made by the banks independently of the subsidiary upon the security of a farm in Cass county, an office building in Kansas City, and a body of standing timber in northern California. The subsidiary was to assume also certain accounts payable to the defendant. The loans of the banks to be assumed by the subsidiary were also to be guaranteed by the defendant. This plan was carried out.

The assets transferred to the subsidiary aggregated $5,332,592.87. The current liabilities assumed by it were in the total sum of $2,356,068.60. All of the current assets were not transferred by the defendant. It retained approximately $500,000 of free assets to meet its current obligations. Among other properties transferred to the subsidiary were the retail lumber yards previously operated by the defendant; also accounts and notes receivable arising from the sales operations of the defendant.

Previously, the defendant had been engaged in the manufacture and sale of lumber. The subsidiary took over the sales branch of its business. From the foregoing, the deduction may properly be made that the subsidiary was formed "for the re-establishment and maintenance of a satisfactory credit situation and the payment of current obligations which could not be refinanced."

These questions naturally arise: Did the subsidiary undertake to carry out the foregoing objects as a mere instrumentality, agency, adjunct, or department of the defendant? Did transactions with the subsidiary work inequitably among creditors of

the defendant? A proper decision of the case will be an answer to these questions. The master answered by saying: "I do not believe, under the facts in evidence in this record that the Sales Company was a mere instrumentality, agency, adjunct or department of the Lumber Company."

It would aid in a solution of the problem to analyze the following subjects:

1. The auxiliary functions of the subsidiary.

2. The effect of its formation upon the defendant.

3. The effect upon the banks.

4. The effect upon other creditors.

5. The rights of interested parties at the time of its formation.

Other questions will be discussed and pertinent portions of the evidence reviewed in the course of this memorandum opinion.

1. At the outset, intentional wrong or active fraud should be eliminated from all consideration. The motives of the parties cannot be impugned. It was the object of each and every one connected with the formation of the subsidiary to re-establish the credit of the defendant and thereby enable it to "carry on." This was deemed in the interests of stockholders, bondholders, lienholders, general creditors, and such interest as the public might have in the continuing operation of a previously prosperous and successful business. Moreover, at the time of the transactions complained of, all the parties had every reason to believe that there would be a marked improvement in the then economic conditions and that the defendant would at an early date be freed of its financial embarrassment and in a position to continue its once successful operation. There was neither actual fraud nor bad motives.

2. Every reasonable presumption must be indulged in favor of the validity and propriety of the subsidiary corporation. The fact that its stock was all owned by the defendant and managed by the same officers and that it was closely affiliated would not destroy its separate entity. Majestic Co. v. Orpheum Circuit (C. C. A.) 21 F.(2d) 720. However, on the question as to whether or not the subsidiary was a mere agency of the defendant, the foregoing circumstances will not be disregarded. Owl Fumigating Corporation v. California Cyanide Co. (D. C.) 24 F.(2d) 718, 720.

Bearing in mind that the purpose of the subsidiary was "for the re-establishment and maintenance of a satisfactory credit situation and the payment of current obligations which could not be refinanced," an inquiry is warranted as to what office the subsidiary performed in the consummation of such objectives. There were four kinds or classes of pressing obligations at the time. First, the open market paper in the sum of $850,000. Second, the timber purchase contracts in the sum of $850,000. Third, the bank loans in the sum of $1,700,000. Fourth, current bills payable. These constituted in part at least "the congestion of maturities" mentioned by the master.

The open market paper in the sum of $850,000 was satisfied by an independent loan made upon the security of a large farm in Cass county, an office building in Kansas City, and standing timber in northern California, except the sum of $200,000 then advanced by George H. Burr & Co. The maturity of the timber purchase contracts in the sum of $850,000 was postponed by an arrangement with the holders of said contracts. The notes of the banks in the sum of $1,700,000 and the $200,000 advanced by George H. Burr & Co. and current bills only remained for settlement or satisfactory renewal.

The functions of the new corporation were thus limited to the satisfaction of the bank claims and the advancement made by George H. Burr & Co. and the payment of current bills or a portion of them. Upon the evidence in the case and from the large amounts of quick assets held by the company, it is obvious that the $200,000 advanced by George H. Burr & Co. and current bills payable could have been liquidated out of current assets. It appears, therefore, that practically the sole object of the subsidiary corporation was to arrange for the satisfaction in some way of the short-time loans made by the banks. According to the evidence, this could not have been satisfactorily arranged by increasing the bond issue of the defendant, although its surplus of assets over liabilities under ordinary circumstances would have supported such a course. All agreed that this was not feasible.

Under the law, the defendant could have pledged its free assets to the banks as security upon their loans. Alberger v. Bank, 123 Mo. 313, 27 S. W. 657. This did not appear to be feasible because such a procedure would have inevitably and seriously affected adversely the credit structure it was necessary to erect. Although there was an agreement that the banks would extend credit to

the sales company for its future operation, yet that was not done. Stripped of all other inferred or avowed objectives, the primary purpose of the subsidiary was to "improve the position" of the banks. It was thought that by strengthening the position of the banks, the credit of the defendant would be improved and as a sequence the position of all the creditors, whether secured or otherwise, would in like manner be improved. Therefore, it appears that the sole function of the subsidiary was to reestablish the credit of the defendant by strengthening in the first instance the position of the banks as creditors. Whether the subsidiary was a mere agency or instrumentality, adjunct, or department of the defendant may depend somewhat upon the effect of its organization and operation upon the defendant, the banks and creditors, as well as upon the existing condition of the defendant at the time it was formed.

3. The immediate effect upon the defendant was to take out of its treasury current and fixed assets in the sum of $5,332,592.87. The transaction relieved it of current liabilities in the sum of $2,356,068.60. This established within the subsidiary a ratio of quick assets to current liabilities of two to one, as ordinarily required by the banks for credit purposes. Necessarily, it left the defendant in a worse condition than it was before, although it placed the burden of operation upon the subsidiary. Upon the evidence this ratio of quick assets to current liabilities did not serve the credit needs of the defendant company for the reason that there was no longer an occasion to utilize extensive credit in its operation. The assets of the subsidiary, however, did serve the purpose to secure the claim of the banks and a few other creditors by affording to them assets upon a ratio to liabilities of approximately two to one. The condition of the defendants was not improved unless the subsidiary be treated as an instrumentality. Previously, it had been engaged in conducting its own sales department. There was no apparent reason why it could not continue its selling operations because it was able to liquidate its manufactured products through the sales department. Its cash income was derived from that source.

There was no avowed object for creating the subsidiary save only to improve the financial situation of the defendant. It did not accomplish that purpose unless it be considered that the subsidiary was a mere agency, adjunct, instrumentality, or department of the defendant.

4. The evidence showed, and the master found, that the position of the banks was improved by the transaction. It furnished them a measure of security on their loans. It sequestered practically all the more liquid current assets of the defendant into the corporate body of the subsidiary and charged such assets with the liability of the bank loans. Although $100,000 was advanced to the subsidiary by the banks, yet that sum was subsequently repaid out of the proceeds of the loan on the farm, etc. The banks did not extend any further credit to the subsidiary. In fact, upon the evidence in the case the subsidiary was in such a position that additional credit became unnecessary. The nature of its operation would not require extensive credit. It must be acknowledged that the net result of the transaction was to give the bank creditors a superior position with respect to all other creditors.

5. It appeared from the evidence and the master properly found that current assets were left in the defendant company in an amount sufficient to meet the bills payable and other current obligations of the defendant not assumed by the subsidiary. However, these obligations were not discharged.

The secured creditors had rights in the common fund made up of unencumbered free assets. Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 S. Ct. 360, 43 L. Ed. 640; Chemical National Bank v. Armstrong (C. C. A.) 59 F. 372, 28 L. R. A. 231.

The effect of the transaction upon the other creditors of the defendant was to reduce their security. Correspondingly, as the position of the banks was improved, the position of the other creditors must necessarily have been impaired. One is the concomitant of the other. Such is true unless the subsidiary was a mere agency or instrumentality of the defendant. This would create an inequitable situation as between creditors. If an independent entity, the position of one class was improved while the position of another class was impaired, although the avowed object of the subsidiary was to improve the credit situation of the defendant.

It was argued that it was within the right of the banking creditors to demand and receive a pledge of the free assets as security upon their loans. This right is un-

deniable. If that course had been pursued, other creditors may have taken steps also to protect themselves in the same manner. This would have meant, of course, receivership at the time.

6. This leads to a discussion of the conditions of the company at the time the subsidiary was formed. As a postulate, it may be said that commercial insolvency signifies inability to pay debts in the ordinary course of business. Bielaski v. National City Bank of New York (D. C.) 58 F.(2d) 657; Davis v. Seneca Falls Manufacturing Co. (D. C.) 8 F.(2d) 546; Cincinnati Equipment Co. v. Degnan (C. C. A.) 184 F. 834; Dutcher v. Wright, 94 U. S. 553, 24 L. Ed. 130; American Can Co. v. Erie Preserving Co. (C. C. A.) 171 F. 540; Bushman v. Bushman, 311 Mo. 551, loc. cit. 564, 279 S. W. 122; May v. Gibler, 319 Mo. 672, loc. cit. 677, 4 S.W.(2d) 769; H. Muehlstein & Co. v. Hickman (C. C. A.) 26 F.(2d) 40, loc. cit. 44, 58 A. L. R. 1294.

According to all the evidence in the case at the time the subsidiary was formed, the defendant company could not then meet the test of commercial solvency. Such was the testimony of the witnesses and the master substantially so found. It was to avoid an acknowledgment of commercial insolvency that the expedient of the subsidiary was employed. Otherwise, the defendant could not have paid its debts, in the ordinary course of business. If, therefore, commercially insolvent at that date, the equitable rights of the parties became then fixed. It was the right, however, of any creditor to obtain security on his claim even though such an act involved a preference. The law, however, would not permit this to be done by indirection. It could only be done by open covenants, openly avowed and openly entered into. It was the right of each creditor to know what other creditors had lawfully done in the matter of taking security. For that purpose, the law of the place prescribed the legal procedure for taking valid security. The preferred creditor under such circumstances must afford at least constructive information to existing creditors and to future creditors that he has such preference. The preferred creditors in the case at bar did not furnish that information. Other creditors of the defendant were not in a position to learn how much of the assets, if any, had been sequestered and put beyond their reach. Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 691.

It is true that the subsidiary operated with such signs and indicia as to acquaint the public with the circumstance that it was operating the sales department of the defendant, but this did not advise the public whether such operation was as agent or as owner and, if the owner, as to what assets of defendant, if any, had been transferred to it and the terms of the transfer. Although not intended, yet the result of the operation was to serve as a blind as against all creditors who might otherwise have been moved to demand security upon their claims.

In view of the foregoing, the presumption of separate corporate entity was overcome by the evidence. It appeared that the subsidiary functioned as a mere agency and department of the defendant. Hamilton Ridge Lumber Sales Corporation v. Wilson (C. C. A.) 25 F.(2d) 592; Bishop v. United States (C. C. A.) 16 F.(2d) 410; Chicago Mill & Lumber Co. v. Boatmen's Bank (C. C. A.) 234 F. 41, loc. cit. 45; Owl Fumigating Corporation v. California Cyanide Co., supra. As said in the last-cited case: "Under such circumstances, courts of equity will not permit mere form to defeat justice and will deal with the substance of the transaction as if separate corporate entities did not exist." See, also, Chicago, Milwaukee & St. Paul Railway Co. et al. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229, and Central Republic Bank & Trust Co. v. Caldwell et al. (C. C. A.) 58 F.(2d) 721, loc. cit. 735.

It is unnecessary to discuss other questions raised by the exceptions to the master's report. While in full agreement with the findings of fact made by the master, the court is unable to arrive at the same conclusion of law. Accordingly, it must be held upon the evidence and under the law that the subsidiary was but a mere agency and instrumentality of the defendant, and that the receiver should disregard its corporate form and take into his immediate possession and control the assets now held by it.

On account of the large interests involved and the diversity of opinion between the master and the court, orders in the premises will be withheld until the questions presented shall have been reviewed by the appellate courts, if an appeal be deemed desirable or advisable.