**INDUSSA CORPORATION**

v.

**RELIABLE STAINLESS STEEL SUPPLY COMPANY.**

**Civ. A. No. 71–6.**

United States District Court,
E. D. Pennsylvania.

Jan. 30, 1974.

John P. O'Dea, Philadelphia, Pa., for plaintiff.

Max C. Baylinson, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

EDWARD R. BECKER, District Judge.

This case involves a claim by the plaintiff for the balance due on goods sold and delivered, and a counterclaim by defendant for damages for non-delivery of certain other goods. Following a one day nonjury trial, we found for the plaintiff in the sum of $16,850.60 plus interest on the principal claim,[1] and found for the plaintiff against the defendant on the counterclaim. In support of our verdict, we delivered, at the conclusion of the trial, a bench opinion containing findings of fact and conclusions of law. That opinion, as edited, is annexed hereto. This memorandum addresses defendant's motion for a new trial or judgment notwithstanding the verdict.

The goods involved were aluminum sheets which the plaintiff had imported from Norway and Japan. The parties had entered into seven contracts for the purchase and sale of that aluminum. Delivery was made on the first five contracts. Defendant paid the sums due on the first two contracts (although they were overdue when paid). The third, fourth and fifth contracts, on which the aluminum was also delivered, were the subject of plaintiff's claim. Defendant did not dispute its liability to plaintiff for the $16,850.60 which was past due on those contracts. The only disputed claim was the counterclaim, which was based on plaintiff's failure to deliver to defendant the aluminum covered by the sixth and seventh contracts. Plaintiff concedes that it did not deliver those shipments, having stopped delivery on February 28, 1969, while the goods were in transit on the high seas.

Plaintiff's stoppage of delivery was founded upon its invocation of sections 2–702 and 2–705 of the Uniform Commercial Code ("Code"),[2] which govern a seller's right to refuse or stop delivery when the buyer is insolvent within the Code definition of insolvency (§ 1–201(23) ).[3] In our bench opinion, we

---

1. The interest amounted to $8,590.23, hence the total judgment was $25,440.83.

2. The parties did not dispute the applicability of the New York Uniform Commercial Code under ¶ 16 of the contracts.

3. Under the Code, a person who "cannot pay his debts as they become due" is insolvent.

One should note that the potential impact of this broad Code definition of insolvency is counterbalanced by the narrowness of the

found the defendant to have been insolvent,[4] justifying the plaintiff's failure to deliver the sixth and seventh orders.

The posttrial motions assign a variety of errors. Many of the assignments relate to the integrity of our findings of fact, particularly those in which we credited the testimony of plaintiff's witnesses and rejected some of the testimony of defendant's witnesses. Under rule 59(a), F.R.Civ.P., we are free to open the judgment and amend our findings of fact, but we have, after careful review, decided to adhere to our original findings, with the exception of three additional findings which we have set forth in note 4, *supra*.

We have also reviewed our conclusions of law and have decided to amend our conclusions with respect to the question of plaintiff's obligation to notify the defendant promptly of the decision not to deliver the goods ordered. In our bench opinion, we stated our conclusion that plaintiff had no such duty to notify because it intended to make no claim against the defendant for damages. For the reasons which follow, we now withdraw the conclusion that the plaintiff had no such duty. However, we reaffirm our earlier conclusion that the defendant proved no damages resulting from plaintiff's breach of its supposed duty to notify. Hence defendant's motions will be denied. Our change in position reflects the benefit of a more careful study of the law than time permitted during the trial.

The basic problem is that the Code does not address the notification question. Section 2–702 lists two seller's remedies on discovery of buyer's insolvency.[5] The first, which was not resorted to here, allows the seller to refuse delivery except for cash. The second, which was invoked here, allows the seller to stop delivery under section 2–705. That section reads, in pertinent part, "The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent (Section 2–702) . . . . ." Neither section indicates whether notice is required, although notice seems implicit in the other § 2–702 remedy of refusal to deliver except for cash.[6]

---

seller's remedies resulting from buyer's insolvency.

4. Our finding of insolvency was based upon the inordinate delay of defendant in paying its debts to plaintiff. We also found that, at the time in question, there was no reasonable expectation that defendant would, at the time of delivery, have paid the balance past due or the $50,000 which would be due thirty days after delivery of the sixth and seventh contracts. We rejected defendant's contention that the parties had agreed to an extension of the due dates of the invoices involved. We also now make these additional findings which we inadvertently omitted from our bench opinion: First, the plaintiff knew of defendant's insolvency on February 28, 1969, because the plaintiff knew all the facts on which we based our finding that defendant was insolvent on that date. Second, the plaintiff also had a Dun & Bradstreet report indicating that Reliable was delinquent in payments to other creditors. (We admitted this report not for proof of the statements it contained but rather only to show what Indussa knew on February 28, 1969, about Reliable's financial condition.)

Third, Indussa stopped delivery on February 28, 1969.

Shortly after the events in question, defendant went out of business because of financial difficulties.

5. Section 2–702(1) reads:

Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article (Section 2–705).

6. We have carefully considered the possibility that the two remedies in 2–702 must be exercised together (since the conjunctive "and" joins them in the text), with the result that the implicit notice to which we refer would always be given when goods are stopped in transit. We reject this possibility for the following reasons. *First*, the two remedies derive from clearly independent remedies given by §§ 54(1)(c) and 57 of the repealed Uniform Sales Act. *Second*, use of the word "and" can indicate that two options may, but need not, both be exercised, whereas "or," while allowing an election, or use of both options, never means that both options *must* be exercised. Comment 1 to this section

■ The defendant cites section 2–706(3) as requiring the seller to give notice. This section is inapplicable here, however: it deals with the seller's right to recover from the buyer the difference between resale price and contract price after reselling undelivered goods, and merely requires notice of the seller's intention to resell at private sale. The plaintiff did not claim its remedies under this section, and we see no reason why this notice requirement should survive the nonexercise of the other provisions of this elective section.

■ The defendant has also argued that the notification point must be resolved in its favor because of plaintiff's failure to give it an opportunity to give adequate assurance of performance under § 2–609, which inherently involves the giving of notice. That section provides in part: "when reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." It is true that comment 1 to § 2–705 states that "where stoppage occurs for insecurity it is merely a suspension of performance, and if assurances are duly forthcoming from the buyer the seller is not

entitled to resell or divert." But that comment is present because § 2–705 gives the seller the right to stop delivery of certain large shipments not only for buyer's insolvency, but also, *inter alia,* "if for any other reason the seller has a right to withhold or reclaim the goods." The latter would include insecurity. The answer to defendant's argument is that the insecurity and insolvency provisions are separate concepts, treated separately by the Code, giving separate grounds for stoppage of delivery. In addition, the right to demand assurance conferred by § 2–609 is stated as permissive, not mandatory.

■ Defendant also argues that a notice requirement must be read into § 2–712 (buyer's right to cover after non-delivery), pointing out that a buyer cannot cover until he knows there will be no delivery. However, the language of § 2–712(1) makes plain that the buyer's right to cover arises only after a non-delivery in breach of the contract.[7] The seller did not breach the contract here, the buyer did; hence that section does not apply to this case.

■ The parties have not cited any cases on the notification point, and we have been unable to find a case, somewhat to our surprise, since this seems hardly a point of insignificant technicality. We turn, therefore, to the general

---

speaks of the "seller's right to withhold the goods *or* to stop delivery except for cash" (emphasis added), from which we infer that use of the word "and" in the Code was not intended to preclude a seller from exercising only one of the two remedies. *Third,* the remedy of stoppage in transit is discussed in 2–705 as though it can stand on its own. *Fourth,* we would hesitate to strain to read the Code's text in such a way as to alter the rights and 'remedies apparently authorized in the Code by linking them together, where the drafters of the Code could easily have made such links plain by minor changes in the text. Similarly, we have rejected Reliable's suggestion, see p. 979, that we read the 2–609 right to demand assurances as a precondition to the exercise of 2–702 rights. Even though such links might make good sense in many commercial contexts, we would want a stronger impetus than that be-

fore making such a substantial addition to a tautly drawn statute. *Fifth,* requiring a seller to deliver to an insolvent buyer who can pay cash for the delivery and for overdue debts on previous deliveries under the contract might, under the Bankruptcy Act, leave the seller with no more than a voidable preference as to the portion of the payment which covers the antecedent debt. *See* 11 U.S.C. § 96. *Sixth,* in the factual context of this case, our findings make clear that an offer to deliver for cash (including cash payment of past due sums) would have been futile since plaintiff already knew defendant was unable to make such cash payment.

7. Section 2–712(1) (emphasis added):
(1) *after a breach* within the preceding section [seller's repudiation or failure to deliver] the buyer may "cover" . . . . .

requirement of reasonable commercial standards of fair dealing, which provides a guide to interpretation of the Code.[8]

 It appears to us that reasonable commercial standards of fair dealing would, in the circumstances of this case, require plaintiff to notify defendant of its decision to stop delivery. We are particularly influenced by consideration of (1) the ease, simplicity, and minimal expense of giving such notification, (2) the potential benefit to defendant of receiving notification, and the potential harm of not receiving notification, and (3) the absence of any reasons for the plaintiff not to give notification. Accordingly, we withdraw the conclusion stated in our bench opinion that notification is not required, and hold that in the circumstances of this case, Indussa had a legal duty to notify Reliable promptly that it was stopping delivery. This holding does not alter the outcome of the case, however, for defendant proved no damages resulting from breach of the duty to notify, and so is still not entitled to recovery.

 Since the duty to notify does not appear in the Code, naturally the Code has nothing to say about measure of damages for failure to notify. We would define the damages as the harm suffered by defendant as a result of the delay in its learning that the goods would not be delivered. Such harm would be the increase, over the period notification was delayed, in the defendant's cost of acquiring substitute goods.[9]

The decision to stop delivery was made on February 28, 1969. Delivery on the sixth contract was due on March 26, 1969; on the seventh contract, part of the delivery was due in late February and part in April. The place of delivery was Philadelphia. Defendant learned of the non-delivery only at the time delivery was due. Hence the delay in notice was about one month on the sixth contract and one to two months on the second part of the seventh contract.

 Analogizing remedies from § 2–711, defendant could have bought substitute goods[10] and claimed a price increase occasioned by the delay of one to two months (the § 2–712 remedy), or else claimed for the price increase without actually buying substitute goods (the § 2–713 remedy).[11] Defendant claimed that it bought some substitute goods but had no records to substantiate the claim; accordingly, we did not find that it had bought such goods. But more importantly, defendant did not prove that the price of aluminum, either domestic or foreign, increased during the interval in question.[12] Accordingly, we found no proof of damages to the defendant.

8. Section 1–203 implies into every UCC contract or duty "an obligation of good faith in its performance or enforcement." Section 2–103(1)(b) defines "good faith" in sales transactions, in the case of a merchant, as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

9. We reject the possibility that failure to notify renders the exercise of the § 2–705 right ineffectual, which would make the non-delivery a breach, with buyer's remedies detailed in § 2–711 (see text accompanying notes 10–11 infra). This would amount to adding to the Code, without a textual basis, an important precondition to exercise of a remedy.

10. We avoid the word "cover" because we have already held that the seller was not in breach for nondelivery.

11. Both remedies would also add incidental and consequential damages, see § 2–715.

12. There was a price spread of some 10 or 11 cents per pound between domestic aluminum, which was more expensive, and foreign aluminum, which was the subject of these contracts. While the domestic aluminum was immediately available, the foreign aluminum could be acquired only after a six-month delay. If we had found that the plaintiff breached by non-delivery, the defendant could have recovered damages resulting from the price spread if he covered in the domestic market (§ 2–712), or if he did not cover (§ 2–713). However, we held that plaintiff's non-delivery was not a breach, so that we may not measure damages this way. Accordingly, the domestic market quote introduced by defendant is irrelevant. It proved only that domestic alu-

In view of the foregoing opinion, we must deny defendant's motion for new trial and for judgment n. o. v. and thus reaffirm our original judgment in plaintiff's favor on both the claim and counterclaim.

## APPENDIX

### BENCH OPINION (EDITED)

I will make my findings of fact and conclusions of law interspersed with discussion as I go along.

I adopt as findings of fact paragraphs 1 through 14 of the stipulation of uncontested facts. Because those matters are of record, I will not re-recite them now. In accordance with those uncontested facts on the principal claim, I find that the defendant, Reliable Stainless Steel Supply Company, is indebted to the plaintiff, Indussa Corporation, in the sum of $16,850.60 together with interest from the due dates set forth in the stipulation. Indeed, I note that there is no dispute by defendant as to their obligation to the plaintiff on the principal claim. I therefore turn to the counterclaim.

The defendant's counterclaim is predicated on defendant's contention that the plaintiff breached its obligation to defendant in failing to deliver the aluminum ordered by the defendant on Contracts 8976 and 9082. The plaintiff, on the other hand, contends that it was not obligated to make delivery and that it was justified in stopping delivery on those two contracts because within the provisions of the Uniform Commercial Code (which I find applies in this case), and more specifically Sections 2–702 and 2–705, the defendant was insolvent.

Section 2–702 of the Code provides that "where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article."

Section 2–705 provides "the seller may stop delivery of goods in the possession of a carrier . . . when he discovers the buyer to be insolvent . . . ."

The threshold question, therefore, is whether the buyer was insolvent at the relevant time. Insolvency is defined by the Uniform Commercial Code in Section 1–201(23) as follows:

A person is "insolvent" who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law.

I do not find that Reliable Stainless Steel Supply Company, hereinafter referred to as Reliable, was insolvent within the meaning of the federal bankruptcy law. It may well have been, but there is no evidence of that.

I do find, however, that at the time that the plaintiff exercised its remedy under Sections 2–702 and 2–705 of the Uniform Commercial Code [Feb. 28, 1969—see Memorandum Opinion and Order] the following situations obtained [and plaintiff knew each of these facts —see Memorandum Opinion and Order]:

First, defendant was indebted to plaintiff in the sum of $16,850 plus interest.

Secondly, obligations due from defendant to plaintiff had been overdue by as much as four months, and almost four and a half months. Specifically, a September 19, 1968, obligation had not been paid until January 27, 1969. An October 30, 1968, obligation had not been paid at all. A December 18, 1969, obligation had not been paid at all. And with the $16,850 past due, plaintiff was

---

minum was more expensive than the foreign aluminum contracted for here. Instead, we have, in the text, measured damages for non-notification as the price change over the period of delay; the delay was not so long that without it defendant would have had

time to "cover" by purchasing substitute foreign aluminum rather than domestic. As seen above, the delay in notification was one to two months, but six months were required to obtain foreign aluminum.

confronted with the fact that a shipment of $50,000 was on the high seas destined for the defendant.

[Thirdly, plaintiff had a Dun & Bradstreet report indicating that Reliable was delinquent in payments to other vendors—see Memorandum Opinion and Order.]

The Court has heard the testimony of Mr. Rosenberg as to the basis for non-payment, but does not credit that testimony. The Court finds that the action of Indussa, the plaintiff, was in good faith in that in addition to its course of dealings the plaintiff sought a Dun & Bradstreet report to obtain further information as to the financial status of the defendant.

The Court finds that as of February 28, 1969, Reliable, the defendant, could not pay its debts as they became due and was, therefore, insolvent within the meaning of the Uniform Commercial Code.

Insofar as Defendant's Exhibit 4 is concerned, the Court considers that it corroborates the Court's conclusion rather than controverts it. However, the finding that the defendant was insolvent does not end our inquiry and is not dispositive of the defendant's counterclaim in plaintiff's favor because the defendant contends that there was a modification of the payment provisions in the two contracts, to which I have adverted, which obviated any claim that defendant was in breach as of February 28, 1969. Defendant's claim in this regard is predicated on the testimony of Mr. Rosenberg which, of course, is controverted by the testimony of Mr. Fielo, and by D-4, a letter purportedly sent by Mr. Rosenberg to Mr. Fielo.

I hold that it is not necessary to reach the question whether there was, in fact, a conversation between Mr. Fielo and Mr. Rosenberg, to which Mr. Straus was also a party, and the question whether or not D-4 was ever sent. For I also find that the parties in their agreement became bound by Clause 18 of the standard conditions, which provides that the contract constitutes the entire agreement between the parties and no modification shall be effective unless agreed to in writing. Section 2–209 of the Uniform Commercial Code provides that this modification—if it existed—was ineffective to alter the party's obligations. Section 2–209 states that "a signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded." The plaintiff's position in this regard is supported by the case of C.I.T. Corporation v. Jonnet, 419 Pa. 435, 214 A.2d 620 (1965), where Mr. Justice Musmanno stated:

> This specific condition [a no oral modification provision] stands as a stone wall in the path of the defendants' contention.

The opinion recognized, however, that an oral attempt at modification or rescission in the face of a no oral modification provision may constitute a waiver under section 2–209(4). I note that while the parties have agreed that the case is governed by New York law, the Court perceives no difference between New York and Pennsylvania law on this Code issue. Mr. Justice Musmanno wrote:

> " 'Even where the written contract prohibits a nonwritten modification, it may be modified by subsequent oral agreement.' This is true but there must first be a waiver of the requirement which has been spelled out in the contract. Otherwise, written documents would have no more permanence than writings penned in disappearing ink. If this, the defendants' argument, were to prevail, contractual obligations would become phantoms, solemn obligations would run like pressed quicksilver, and the whole edifice of business would rest on sand dunes supporting pillars of rubber and floors of turf. Chaos would envelop the commercial world."

While this Court lacks the capacity to so eloquently describe the situation and, indeed, doubts that the rather mundane

context of this case would warrant such grandiloquent language, the Court does not find a waiver of the nonmodification provision in this case. There is nothing in the parties' conduct which evinces, in the Court's view, an intention to waive these provisions.

With respect to damages resulting from plaintiff's stoppage and non-notification of stoppage, I make the following observations. When the stoppage was undertaken by the plaintiff in contravention of the purported January 8th modification, the defendant was placed in the position of purchasing other aluminum. At that juncture, in order to obtain aluminum by the time that it would have obtained it had the shipments arrived, defendant had to purchase domestic aluminum. There has been no evidence in this case that there was an increase in the price at any time relevant hereto of either domestic or foreign aluminum. The only evidence has been that there was a spread of some 10 or 11 cents per pound between domestic and foreign aluminum. Whether the plaintiff acted when it did or at some later time, the time spread was not sufficient to have enabled the defendant to purchase foreign aluminum because the evidence is that it takes six months to obtain foreign aluminum. So whether the plaintiff acted when it did or whether it acted at a later time, the defendant would have been in precisely the same position.

I now proceed to certain alternative findings which further require the result I have reached in this case. Even if the oral modification could be effective, I must decide whether such a modification was in fact made. An effective oral modification could come only from a manifestation of mutual assent between Mr. Rosenberg and Mr. Fielo with respect to the matter. And I find that D-4, if sent by Mr. Rosenberg to Mr. Fielo, would not constitute such a manifestation of such assent because it was a unilateral document. Mr. Fielo has denied receiving it. I need not resolve the question of whether Mr. Rosenberg sent it or Mr. Fielo received it, because that fact is of no legal significance in the Court's view. The only possible manifestation of mutual assent would have been in the conversation between Mr. Rosenberg and Mr. Fielo. I do not doubt Mr. Rosenberg's testimony that he had a conversation with Mr. Straus and that Mr. Straus agreed to the terms which Mr. Rosenberg said that he did. But I also find, based upon the testimony of Mr. Fielo and particularly Mr. Rosenberg, that Mr. Straus had no authority to make any such modification. I find that defendant has not met its burden of proving that Mr. Fielo was a party to the conversation. Mr. Fielo has, of course, denied it. Accordingly, defendant has not met its burden of proving that there was such a modification.

Having found that Reliable was insolvent in the Code sense and that there was no valid modification, I must reach the question whether Indussa incurred liability by its failure to notify Reliable that it was exercising its rights under §§ 2–702 and 2–705 or that it was disposing of the merchandise. In this regard I note that, although the notion of insecurity is mentioned in the Comment to § 2–705, I do not deem 2–705 or 2–702 to be insecurity clauses. Section 2–609 of the Code is an insecurity clause which gives a party who has reasonable grounds for insecurity the right to demand adequate assurance of performance and to exercise certain remedies if that adequate assurance is not forthcoming. I do not find exercise of that right a precondition to the exercise of remedies under § 2–702 or § 2–705. And I find the Comment under § 2–705 referring to insecurity to be informational only. Insecurity and insolvency are two separate and distinct notions. I therefore find that Indussa had no obligation to give Reliable the opportunity to make adequate assurance of performance. Neither do I find any obligation on the part of Indussa to notify Reliable that it had disposed of the merchandise. I do consider it morally reprehensible that Indussa gave no such notice to Reliable,

and I would certainly hope that in similar situations in the future Indussa's corporate conduct would be guided by proper moral principles. But, on the other hand, I find no legal obligation to do so. Neither do I find any harm to Reliable because of its failure to do so since the delay of some sixty days or seventy-five days would not have been sufficient to enable Reliable to obtain foreign aluminum. With or without notice they would have been relegated to purchasing domestic aluminum at a higher price, but there was no evidence in this record that prices increased during the period of delay.

I further find that there was no reasonable expectation that Reliable would have complied with its obligation to pay the balance due under the principal claims and the $50,000 additional shipment. And I add this finding to my finding on the subject of lack of damages because on the basis of this record, I believe that not having lived up to its contractual bargaining in terms of its immediate need or prospective near-future need to satisfy its customers, Reliable would have been obliged to purchase domestic aluminum, in any event.

Accordingly, having found that Indussa had a right under Sections 2–702 and 2–705 to stop delivery of the goods and to dispose thereof because of the insolvency, in the Code sense, of Reliable, and that the terms of payment had not validly been extended, and having found that the failure of Indussa to notify Reliable that it was exercising its rights under §§ 2–02 and 2–705 and that it had disposed of the merchandise is of no legal effect and caused no damages, I find for the plaintiff, Indussa, and against the defendant, Reliable, on Reliable's counterclaim.

I hold, as conclusions of law, that the Court has jurisdiction of the parties and of the subject matter, that the law of New York is applicable, that under the evidence and under the law Indussa has met its burden of proving the obligation of Reliable to it on the principal claim in the sum of $16,850.60 plus interest,

and that Reliable has not met its burden of proving Indussa's obligation to it on the counterclaim, and accordingly I will render judgment in favor of Indussa and against Reliable on the principal claim in the amount that I have stated, and will render judgment in favor of Indussa and against Reliable on Reliable's counterclaim.