**In re PROGRESSIVE FARMERS ASSOCIATION, Debtor.**

**SOUTH CENTRAL ENTERPRISES, INC., Edwin M. Lipscomb Farms, Inc., and Caleb Lipscomb and Ellen Lipscomb, Plaintiffs,**

v.

**Richard FARRINGTON, Trustee, Defendant.**

**Bankruptcy No. 77–30153–B–S.**

United States Bankruptcy Court, W.D. Missouri, S.D.

June 12, 1985.

Richard Farrington, Springfield, Mo., Trustee.

Lincoln J. Knauer, Springfield, Mo., for Trustee.

David F. Sullivan, Springfield, Mo., James W. McManus, Kansas City, Mo., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

This case arises under the Bankruptcy Act, July 1, 1898, 30 Stat. 544, now re-

pealed. Generally jurisdiction is retained by this Court under the provisions of Section 403(a) of Pub.L. 95–958, Title IV, Nov. 6, 1978, 92 Stat. 2683, despite the repeal of the Bankruptcy Act. The various creditors filed a reclamation petition in the Bankruptcy Court and the trustee filed a counterclaim for rescission. The matter was tried and appealed. The District Court remanded the proceeding for further findings. Extensive hearings were held and the evidence and briefs were submitted to this Court for ruling.

## I

Debtor was organized to market various products to farmers. As part of that sales effort it agreed to purchase from Caleb and Ellen Lipscomb, husband and wife, South Central Enterprises, Inc., a Missouri corporation, and Edwin M. Lipscomb Farms, Inc., a Missouri corporation, hereinafter Lipscomb, various businesses and properties owned by the entities. Although some of the transactions were never closed, debtor operated the businesses and the properties until shortly before it filed bankruptcy when Lipscomb attempted to accelerate the obligations and reclaim the properties.

In the amended complaint for reclamation filed June 3, 1977, Lipscomb pleaded that he had conveyed certain assets, real and personal, to debtor and that "Petitioners took possession of said property by reason of default in said promissory notes on May 9, 1977." In Count I he prayed for return of the Aggieville Springfield personal property. In Count II, he prayed for, inter alia, reclamation of "the real property known as 601 and 701 Front Street, Monett, Missouri" and in Count III for, inter alia, reclamation of "the real estate known as Aggieville Store and Lipscomb Elevator, Liberal, Missouri". The evidence only shows notice of default on that date and a demand for possession. It also shows Lipscomb ousted by PFA a few days earlier. The evidence does show Lipscomb operating on May 10, 1977, Transcript May 13, 1977, p. 9–10, 2nd partial. Possession at the date of filing was under the auspices of the receiver appointed by the Court. In addition, the evidence shows on May 9, 1977, that debtor had possession of all the property, real and personal, described in the petition but that Lipscomb had never delivered title to the real property. Transcript May 13, 1977, p. 16–17, 2nd partial. The trustee answered and counterclaimed for rescission alleging petitioners had breached the contract of sale and misrepresented their ability to deliver clear title causing substantial prejudice to debtor.

The Bankruptcy Court heard the reclamation petition and the counterclaim in rescission and found in favor of the trustee and awarded the trustee the sum of $458,-825.10 as the difference between reasonable rentals and payments received by Lipscomb. The Court denied reclamation finding that the properties had been in the hands of Lipscomb since before the filing of the bankruptcy. Lipscomb appealed.

The District Court held that the Bankruptcy Court properly exercised its jurisdiction as Lipscomb had consented. Pages 4 and 5, opinion dated November 27, 1979, citing § 23(b) of the Act, § 46(b), Title 11, U.S.C. The District Court also found that there was no default on the contractual obligations due Lipscomb.

"Appellants argue that bankrupt was in default of its contractual obligations because it failed to tender the May 1977 installment payment on or before May 9, 1977. The Bankruptcy Court found that appellants, by previously accepting bankrupt's late payments, waived their right to payment by the 6th of the month, and that the contract was thereby modified to permit bankrupt a reasonable time in which to make the monthly payments. (Opinion at 3, 19). These findings of fact are supported by substantial evidence and are not clearly erroneous; accordingly, this Court holds that bankrupt's failure to tender the May 1977 installment payment by May 9, 1977, was not a default entitling appellants to foreclose their security interests. Rules Bankr.

Proc. Rule 810". Page 7, opinion dated November 27, 1979.

The District Court, however, went on to discuss issues that arose from an examination of the relevant Missouri law and the underlying documents. The District Court found that:

"The Bankruptcy Court, however, failed to make findings of fact as to whether bankrupt was otherwise in default of its obligations under the security agreements. This action will therefore be remanded so that the Bankruptcy Court may determine whether any of the events constituting default under Part IV of the security agreements took place on or before May 9, 1977. If the Bankruptcy Court finds that bankrupt was in default of its obligations under the security agreements, then appellants must be held to have been entitled under Part V of the agreements and under § 9–501(1) of the Uniform Commercial Code, R.S.Mo. § 400.9–501(1) (1959), to foreclose their security interests in the collateral described in those agreements. If appellants were entitled on May 9, 1977, to foreclose their security interests in that collateral, then the Trustee's counterclaim for recission [sic] must be denied.

The Bankruptcy Court also failed to make findings of fact as to whether bankrupt was in default under any provisions of the contract for the sale of Aggieville. Under present Missouri law, actual insolvency of a party to a contract may be an anticipatory breach of contract excusing further performance by the solvent party. Although an early case, *Cornett v. Best*, 151 Mo.App. 546, 132 S.W. 35 (Mo.App.1910), is to the contrary, the law in this state is that insolvency may, but does not always, excuse further performance by the solvent party. *First State Bank v. Reorganized School District R–3, Bunker*, 495 S.W.2d 471, 479 (Mo.App.1973). *See also Central Trust Co. v. Chicago Auditorium*, 240 U.S. 581, 591 [36 S.Ct. 412, 415, 60 L.Ed. 811] (1916); S. Williston, *Contracts*, §§ 1308, 1324 (3d ed. 1968); *Restatement of Contracts* § 287(1), (1932); 17 Am.Jur.2d., *Contracts*, § 430 (1964). This Court holds that if bankrupt were insolvent on May 9, 1977, appellants were excused from the duty of tendering title to the real estate, and the Trustee's counterclaim for rescission must be denied. This cause will therefore be remanded to the Bankruptcy Court for a finding of fact as to whether the bankrupt was, on May 9, 1977, actually insolvent". Page 7–8, opinion of November 17, 1979.

Judge Jones passed away in November of 1979. This writer was sworn in as his successor in May of 1980. A review of the trial transcripts revealed that Lipscomb had pleaded that debtor was solvent on the day notice of default was given and that neither party had introduced evidence on the question of debtor's solvency. Thereafter Lipscomb requested an opportunity to present additional evidence which was granted.

II

The transactions out of which this litigation arose were memorialized by agreements dated December 5, 1975, and instruments executed thereafter. The agreements were executed by debtor as buyer, on the one hand, and Caleb Lipscomb and Ellen Lipscomb, South Central Enterprises, Inc. and Edwin M. Lipscomb Farms, Inc., as sellers. Lipscomb personally, with his wife, owned all of the entities in one fashion or another. The properties sold were Lipscomb Agricultural Supply, Lipscomb Elevators and Aggieville. Excluded from the sale was "the real property and appurtenant fixtures located at 1120 East Trafficway, Springfield, Missouri" and certain land and appurtenances owned by Lipscomb Farms, together with some accounts receivable.

For their interests the Lipscombs received $200,000 of which $13,333,33 was paid in cash, the balance to be represented by a note, "dated as of the date of transfer of the real property provided for herein".

South Central Enterprises, Inc., was paid $450,000 for its interests of which $30,000 was cash and the balance to be evidenced by a note "dated as of the date of transfer of the real property provided for herein". Edwin M. Lipscomb Farms, Inc., was to receive $250,000 of which $16,666.67 was paid in cash and the balance to be evidenced by a note "dated as of the date of transfer of the real property provided for herein".

The notes called for in the agreements were executed in January of 1976. Two deeds of trust were executed in April of 1976 but never recorded. The property in which sellers took a security interest was located in Monett, Barry County, and Springfield, Greene County, Missouri. Apparently no security interest in the Liberal, Missouri, property was created. Judge Jones, in his Order of September 8, 1977, found that "no real estate was ever transferred from Lipscomb to bankrupt". P. 4, September 8, 1977 Order. The Court noted that there was a substantial defect in the title to the Liberal property and that debtor had not waived the defect. The finding that sellers never conveyed the real estate to debtor was not disturbed on appeal.

All of the agreements for sale contained warranties of good and marketable title. The agreements also provided that the real estate closings were to occur in January of 1976. The agreements contained only nominal penalties for default but made reference to provisions in the security agreements. The deeds of trust contained provisions for foreclosure upon default. The notes provided that the holder could, at his option, declare all installments due if there was a default as to payment.

The various security agreements described both events of default and the rights and remedies of the secured parties.

### "IV EVENTS OF DEFAULT

Debtor shall be in default under this agreement upon the happening of any one or more of the following events:

1. Default in the payment or performance of obligation, covenant or liability of the Debtor contained or referred to herein, or of any endorser, guarantor or surety for any liability of the Debtor to Secured Party.

2. Any warranty, representation or statement made or furnished to Secured Party by or on behalf of the Debtor for the purpose of obtaining credit or an extension of credit proves to have been false in any material respect when made or furnished.

3. Loss, theft, damage, destruction, or the danger of misuse or confiscation of the Collateral in the opinion of Secured Party, or sale or encumbrance to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon or the issuance of an injunction with respect to the use or sale thereof.

4. Death, dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against, Debtor or any endorser, guarantor or surety for Debtor".

### "V SECURED PARTY'S RIGHTS & REMEDIES

1. Secured Party shall have the right to notify account and contract debtors obligated on any or all of the Collateral to make payment thereof directly to Secured Party and Secured Party may take control of all proceeds of any of the Collateral, which rights Secured Party may exercise at any time whether or not Debtor is then in default. Until such time as Secured Party elects to exercise such rights, Debtor is authorized, as agent of Secured Party, to collect and enforce all such contracts and accounts. The cost of such collection and enforcement, including attorney fees and expenses shall be borne by Debtor whether the same is incurred by Secured Party or Debtor.

2. Upon the occurrence of any of the above events of default and at any

time thereafter (such default not having previously been cured), Secured Party shall have, in addition to all other rights and remedies the remedies of a secured party under the Uniform Commercial Code. Secured Party may, at its option, require Debtor to assemble the Collateral and make it available to Secured Party at a place, to be designated by Secured Party, which is reasonably convenient to both parties, or in the event Debtor fails or refuses to so assemble the Collateral, Secured Party shall have the right, and Debtor does hereby authorize and empower Secured Party to enter upon the premises wherever the Collateral may be in order to remove the same. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition thereof is to be made. The requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Debtor set forth at the beginning of this agreement at least five days prior to the date of sale or disposition.

3. Secured Party may at any time in its sole discretion transfer any securities or property constituting Collateral into its own name or that of its nominee and receive the income therefrom and hold the same as security for liabilities of Debtor to it or apply the Collateral on principal and interest due on such liabilities.

4. Insofar as the Collateral shall consist of accounts receivable, insurance policies, instruments, chattel paper, things in action or the like, Secured Party may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral as the Secured Party may determine, whether or not liabilities of Debtor hereunder are then due, and for the further purpose of realizing Secured Party's rights therein, Secured Party may receive, open and dispose of mail addressed to Debtor and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of the Collateral on behalf of and in the name of Debtor."

### III

Lipscomb originally brought this proceeding in the Bankruptcy Court. On appeal Lipscomb challenged the Bankruptcy Court's exercise of summary jurisdiction over the trustee's counterclaim. That challenge was rejected. Lipscomb, in that appeal, raised no question as to the court's authority to consider the complaint in reclamation. During the course of the trial on remand Lipscomb objected to this Court's jurisdiction based upon the decision of the Supreme Court in *Northern Pipeline Const Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). This Court denied the objection and a motion for leave to file an interlocutory appeal to the District Court was denied by the District Court on November 29, 1982. Lipscomb persists in the objection.

In the objection to jurisdiction Lipscomb contends that the questions of insolvency and of anticipatory breach are issues of state law and require the exercise of judicial power, outside the authority of a bankruptcy judge in light of the holding in *Marathon*, supra. A careful analysis of the pending case shows that *Marathon* and the resulting rules and legislation creating the existing jurisdiction arrangement compels the conclusion that this Court has jurisdiction of all of the issues pending in this proceeding.

Original jurisdiction "of all matters and proceedings in bankruptcy", as those arose under the Bankruptcy Act of 1898, was vested in the United States District Court. Section 1334, Title 28 U.S.C. June 25, 1948, c. 646, 62 Stat. 931. In the Act, a court was defined to "mean the judge or the referee of the court of bankruptcy in which

the proceedings are pending," Section 1(9) of the Act, Section 1(9), Title 11, U.S.C., and "courts of bankruptcy" were defined to "include the United States district courts . . . to which this Act is or may hereafter be applicable". Section 1(10) of the Act, Section 1(10), Title 11, U.S.C.

The courts of bankruptcy were "invested . . . with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this Act . . . to—

"(7) Cause the estates of bankrupts to be collected, reduced to money and distributed, and determine controversies in relation thereto, except as herein otherwise provided . . . and where in a controversy arising in a proceeding under this Act an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed . . . he shall be deemed to have consented to such jurisdiction . . .". Section 2(a) and 2(a)(7) of the Act, Section 11(a) and 11(a)(7), Title 11, U.S.C.

■ Jurisdiction over controversies at law or in equity, "as distinguished from proceedings under this Act "was placed in the district court. Section 23 of the Act, Section 46, Title 11, U.S.C. Such jurisdiction arises when a claimant holds a substantive, adverse claim to that of the trustee. But an adverse party could consent to jurisdiction before a referee, *MacDonald v. Plymouth County Trust Co.*, 286 U.S. 263, 52 S.Ct. 505, 76 L.Ed. 1093 (1932) and an adverse party consented to the referee's jurisdiction by voluntarily invoking that jurisdiction. *Page v. Arkansas Natural Gas Corporation*, 286 U.S. 269, 52 S.Ct. 507, 76 L.Ed. 1096 (1932).

In *Cline v. Kaplan*, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944) the Supreme Court held that an adverse party who timely objected to summary jurisdiction and maintained that objection throughout the proceeding even while participating, by necessity, did not waive the objection to jurisdiction. To deal with the ambiguity created by the holding in *Cline*, supra, as to when

an objection could be preserved, the Congress amended Section 2(a)(7) of the Act to require a creditor to file an early objection or to be found to have waived the objection. 2 Collier on Bankruptcy paragraph 23.08, pp. 544–45 and n. 47 (14th Ed.).

At the time this proceeding was initiated, therefore, the law was well settled.

"Bankruptcy Courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession." *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940).

■ Here, at the time the bankruptcy case was filed, the trustee had constructive if not actual possession of the property which Lipscomb sought to reclaim. The reclamation petition alleged that "pursuant to order of this Court since May 13, 1977 Caleb Lipscomb has operated the business known as Aggieville . . . under the direction of said Receiver . . ." [and prayed] "that the said Receiver be directed to surrender and deliver to [Lipscomb] all of the said goods, property and assets aforesaid . . ."

The proceeding was filed by Lipscomb in the bankruptcy court. The trustee then filed a counterclaim. The Supreme Court has noted that the jurisdictional limits do not restrict the right of a trustee to protect possession or title. *Ex Parte Baldwin*, 291 U.S. 610, 54 S.Ct. 551, 78 L.Ed. 1020 (1934). Even in *Cline*, supra, the Supreme Court recognized consent jurisdiction.

"Consent to proceed summarily may be formally expressed, or the right to litigate the disputed claim by the ordinary procedure in a plenary suit, like the right to a jury trial, may be waived by failure to make timely objection. . . . Consent is wanting where the claimant has throughout resisted . . . and where he has made formal protest against the exercise of summary jurisdiction . . .". *Cline*, supra, at 323 U.S. at 99, 65 S.Ct. at 156.

The reclamation proceeding was ruled and appealed. It was only after hearings

on the remanded narrow issue began that Lipscomb objected to jurisdiction of this Court. The Court finds that Lipscomb consented to the exercise of jurisdiction by this Court. *Matter of Veelock Mfg. Co., Inc.,* 26 F.Supp. 110, aff'd 102 F.2d 993 (3rd Cir.1939); *Matter of Bankers Trust Co.,* 566 F.2d 1281 (5th Cir.1978); *In re Behring and Behring,* 445 F.2d 1096 (5th Cir.1971); *Matter of Citizens Loan & Sav. Co.,* 16 B.R. 157 (W.D.Mo.1981).

The Supreme Court's holding in *Northern Pipe Line,* supra, does not alter this result. In that case the Supreme Court dealt with the question of subject matter jurisdiction which had, by statute, been granted to the district court, Section 1471(b), Title 28, U.S.C. and then "poured over" to the bankruptcy court. Section 1471(c), Title 28, U.S.C.

"We conclude that 28 U.S.C. § 1471 (1976 ed. Supp IV) as added by § 241(a) of the Bankruptcy Act of 1978, has impermissibly removed most, if not all, of 'the essential attributes of the judicial power' from the Art. III district court, and has vested those attributes in a non-Art. III adjunct." Such a grant of jurisdiction cannot be sustained ... *Northern Pipe Line,* supra, 102 S.Ct. at 2880

But this proceeding did not arise under the statute enacted in 1978. The holding in *Northern Pipe Line,* supra, reaches only the grant of independent jurisdiction to a bankruptcy court. It does not touch on the question of the validity of the kind of derivative jurisdiction exercised by referees under the Bankruptcy Act of 1898. If anything, the *Northern Pipe Line* decision and its judicial and legislative progeny, together with the cases discussing magistrate jurisdiction, persuade that the jurisdictional pattern of the Act is sound.

Reacting to the voiding of the grant of jurisdiction the various Judicial Circuits adopted in 1982 an "Interim Rule" for the management of bankruptcy cases and proceedings. The Rule recognized that jurisdiction was in the district court and provided that—

"All cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 are referred to the bankruptcy judges of this district". Section (c) of the Interim Rule.

Other provisions in the Rule permitted the bankruptcy court to exercise most of the authority previously conferred by statute. The Interim Rule was adopted in this judicial circuit and the jurisdictional pattern was confirmed by the Eighth Circuit. *In re Hansen,* 702 F.2d 728 (8th Cir.1983).

The jurisdictional turmoil was put to rest by the 1984 amendments to Title 28 and the Bankruptcy Code. In those amendments the Congress provided that—

"(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

"(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Section 1334(a) and (b), Title 28, U.S.C.

"Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district". Section 157(a), Title 28, U.S.C.

Essentially the jurisdiction pattern promulgated by the 1984 amendments followed that created by the Interim Rule and, more importantly, both mirror the jurisdictional arrangement contained in the 1898 Act. The district court has jurisdiction which is referred to the bankruptcy court with some exceptions not pertinent here. The reclamation petition filed by Lipscomb and the trustee's counterclaim would be core proceedings under the statute. Sections 157(b)(2)(C), (K) and (O), Title 28, U.S.C. No court has yet ruled the validity of this jurisdictional arrangement.

There are cases in similar areas. Within the federal court system, magistrates, although not Article III appointees, perform judicial functions by reference from the district court. The references are authorized by statute. Section 636, Title 28, U.S.C. With the consent of the parties, the magistrate "may conduct any or all proceedings in a ... civil matter and order the entry of judgment in the case ..." Section 636(c)(1), Title 28, U.S.C.

The Supreme Court has sustained the validity of the reference to the magistrate. In *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the issue was raised when a defendant challenged the absence of a *de novo* hearing before the district court on his motion to suppress. The Supreme Court rejected the argument on both statutory and constitutional grounds.

"Congressional intent, therefore, is unmistakable. Congress focused on the potential for Art. III constraints in permitting a magistrate to make decisions on dispositive motions. See S.Rep., at 6, H.R.Rep., at 8. The legislative history discloses that Congress purposefully used the word *determination* rather than *hearing*, believing that Art. III was satisfied if the ultimate adjudicatory determination was reserved to the district court judge. And, in providing for a "de novo determination" rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations. See *Mathews v. Weber*, 423 U.S. 261, 275, 96 S.Ct. 549, 556, 46 L.Ed.2d 483 (1976)". 447 U.S. at 676, 100 S.Ct. at 2412–13. "We conclude that the due process rights claimed here are adequately protected by § 636(b)(1). While the district court judge alone acts as the ultimate decisionmaker, the statute grants the judge the broad discretion to accept, reject, or modify the magistrate's proposed findings. That broad discretion includes hearing the witnesses live to resolve conflicting credibility claims. Finally, we conclude

that the statutory scheme includes sufficient procedures to alert the district court whether to exercise its discretion to conduct a hearing and view the witnesses itself. 447 U.S. at 680–81, 100 S.Ct. at 2415.

"In passing the 1976 amendments to the Federal Magistrate Act, Congress was alert to Art. III values concerning the vesting of decisionmaking power in magistrates. Accordingly, Congress made clear that the district court has plenary discretion whether to authorize a magistrate to hold an evidentiary hearing and that the magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction.

"We need not decide whether, as suggested by the Government, Congress could constitutionally have delegated the task of rendering a final decision on a suppression motion to a non-Art. III officer. See *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). Congress has not sought to make any such delegation. Rather, Congress has provided that the magistrate's proposed findings and recommendations shall be subjected to a *de novo* determination "by the judge who ... then exercise[s] the ultimate authority to issue an appropriate order." S.Rep., at 3. Moreover, "[t]he authority—and the responsibility—to make an informed, final determination ... remains with the judge". [citation omitted]. 447 U.S. at 681–82, 100 S.Ct. 2415.

The constitutionality of the referral to magistrates was challenged after *Raddatz*, supra, based upon language contained in *Northern Pipe Line*, supra. The challenge has been rejected by various courts, including the Court of Appeals for this Circuit. *Lehman Bros. Kuhn v. Clark Oil & Refining*, 739 F.2d 1313 (8th Cir.1984). See also *Pacemaker Diagnostic Clinic of America v. Instromedix*, 725 F.2d 537 (9th Cir.1984); *Collins v. Foreman*, 729 F.2d 108 (2d Cir. 1984). In each of those cases the court

rejected an attack on the constitutionality of the procedure of the reference to magistrates which was based upon the language of *Northern Pipe Line.*

■ This Court concludes, therefore, that a jurisdictional arrangement which is within the control of the Article III court meets constitutional tests of due process and satisfies the requirement that the judicial power of the United States be exercised by an Article III appointee unless the parties agree to another procedure. The holding in *Northern Pipe Line,* supra, does not alter that result. Here the Court finds that Lipscomb consented to the exercise of plenary jurisdiction by the bankruptcy court and made no timely objection to that jurisdiction. The Court holds that it has jurisdiction to enter judgment in this proceeding.

## IV

Having concluded that it has jurisdiction of the issues raised in this proceeding, this Court must examine the evidence to determine whether Lipscomb was entitled to prevail against the trustee on any of the grounds raised by the District Court, although not necessarily pleaded by the parties. The first of these is default under the security agreements or under § 9–501(1) of the Uniform Commercial Code, R.S.Mo. § 400.9–501(1).

The various security agreements describe four categories of events which may be considered defaults. The first of these is "[d]efault in the payment or performance of any obligation, convenant or liability of the Debtor contained or referred to herein ...". On May 9, 1977, Lipscomb served upon various officers and directors of PFA a notice which recited that—

"... by reason of the default in payments under the promissory notes held by the undersigned, that the undersigned do hereby elect to accelerate and make all payments due under said notes immediately due and payable and do hereby demand payment in full of the maker Progressive Farmers Association of each and every such note".

This notice was accompanied by a second notice which was entitled "Notice of Foreclosure" and which recited in part—

"that by reason of default in the terms of said security agreements and promissory notes that the undersigned have and will take possession of all collateral for the payment of said notes as granted them by said security agreements ..."

The evidence presented in the 1977 hearings was directed toward debtor's failure to pay the note installments when due. The Bankruptcy Court found that timely payment had been waived by the conduct of the parties. The District Court affirmed this finding, holding that it was supported by substantial evidence and that it was not clearly erroneous.

Although the notice of foreclosure, served simultaneously with the notice on May 9, 1977, is ambiguous in setting out grounds for declaration of default, the evidence presented in the 1977 hearings does not suggest a default other than non-payment. This Court finds that except for the alleged untimely payments there are no allegations of defaults as to the first category of requirements and the evidence of that default, as has been noted, is insufficient to support an order of relief.

The second of these is the existence of materially false warranties or representations which induced the secured party to extend credit. There is no evidence of any such warranties or representations made to the secured party. The third category is

"... the danger of misuse or confiscation of the Collateral in the opinion of Secured Party ... or the making of any levy, seizure or attachment thereof or thereon or the issuance of an injunction with respect to the use or sale thereof".

At the time Lipscomb served notice of default, the SEC was investigating PFA as to the sale of "Estate Builder" interests. None of the Lipscomb properties or businesses were involved in such sales although a person purchasing an Estate Builder interest was entitled to certain privileges when purchasing Aggieville mer-

chandise. From what little evidence there is, this Court concludes, without making a definitive finding, that an Estate Builder was a form of annuity. The SEC asserted that it was an unregistered security.

Over the several days preceding the delivery of Lipscomb's notice, the PFA officers, directors and attorneys met constantly to deal with the SEC investigation and to determine a course of conduct. There was some conversation to the effect that the SEC was going to shut down PFA and that Aggieville was going to be closed as part of that effort. Lipscomb himself was involved only peripherally in these conversations.

The PFA meetings appeared to have two purposes in early May of 1977. One was to minimize the impact and reach of the SEC investigation. The other was to consider some form of reorganization using Aggieville and other non-Estate Builder assets as the foundation. Referring to those meetings, Max Lilley, a Springfield attorney, who was consulted about the problem testified that—

"... we were making our investigation to see whether or not it was feasible to try to reorganize them under a chapter ten ...

"We had to see if we had a feasible plan to stay in business. They wanted to stay in business. They were operating at that time ...". Transcript November 9, 1983, Vol. 2, p. 7.

"... it was suggested ... that perhaps Caleb Lipscomb could be used in a reorganization. I remember we did talk about that ... Aggieville was a viable going business and with that nucleus we might be able to effect a reorganization ...". Transcript November 9, 1983, Vol. 2, p. 17.

Lilley testified that PFA had retained an attorney knowledgeable in SEC matters to represent the company. Lilley was retained to assist in any reorganization effort. The SEC complaint was directed toward the stopping of the selling of securities but there was some thought that the effect of an injunction would be to close all

the PFA operations including Aggieville. However, on the 9th day of May 1977 the SEC complaint had not been filed.

Lilley testified that during his involvement, prior to the filing of the bankruptcy, neither Lipscomb nor his attorneys complained to him or to anyone in his presence about the sufficiency of his collateral. Transcript November 9, 1983, Vol. 2, pp. 43–49. Lipscomb, on the other hand, testified that he was concerned for many months about his security.

"Q. Mr. Lipscomb, during 1976, did anything occur as regards to the PFA operations which made you feel insecure?

"A. Yes.

. . . . .

"A. Along in the late spring of '76, the ... cocktail circuit began to quiz me about the rumors that were going on about the PFA operations ... I was advised that the organization ... was delinquent on their bills for merchandise and services that they had purchased". Transcript November 22, 1982, p. 26.

Apparently Lipscomb took no action about any insecure feelings he had in the spring of 1976. In early 1977 he testified that his concerns reappeared when he obtained a copy of the audit which contained a letter from the accountant reserving his opinion and which raised questions about the values of certain properties.

In January of 1977 Lipscomb became involved actively in the management of Aggieville. He took over the checking account "[b]ecause there were monies that were coming out of the Aggieville account to operations other than Aggieville and that Aggieville payables were not being met and I was getting complaints from the suppliers". Transcript November 22, 1982, p. 45.

When Lipscomb took over the Aggieville operation in January of 1977, the business had credit problems and was suffering to some degree from adverse publicity about PFA. Transcript November 22, 1982, pp.

59–91, passim. But Lipscomb was able to stabilize the credit situation. Transcript November 22, 1982, pp. 155–168, passim. Lipscomb also caught up the note payments due the Lipscomb entities, except for the twine note, through April of 1977. Transcript November 22, 1982, pp. 122–127.

In July of 1977, when these events were more recent in everyone's memory, and testimony was not colored by knowledge of the issue identified on remand, Lipscomb testified that there was plenty of money to meet the bills.

"Q. Were they [PFA and Aggieville] operating, in what manner were they operating contrary to your wishes or suggestions? .

"A. They weren't paying the bills on time.

"Q. Well, was that because they didn't have the money or weren't making the money?

"A. No, it was because of a poor selection of priorities, because when I took over in January, we got all our payables up in fine shape".

Transcript July 19, 1977, p. 47.

Thus in early May of 1977, before the SEC investigation came to a head, the Aggieville operation was in good financial condition. There is little question that there was some possibility that, as a result of the SEC investigation, Aggieville could be closed. But it is also clear and the Court so finds that the notice does not declare, as a basis for acceleration of the notes that Lipscomb deems himself to be insecure.

Generally a declaration of default which expresses the state of mind of the secured party must be made in good faith. *Feller v. McKillip*, 109 Mo.App. 61, 81 S.W. 641 (1904).

"A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes ⸝

that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised".

Section 400.1–208, R.S.Mo.1969. See also 69 Am.Jur.2d, Secured Transactions § 323 and Annotation at 125 ALR 313 and 61 ALR3d 244.

In *Miller v. Jones*, 635 S.W.2d 360 (Mo. App.1982) the court held that if a holder of a note decides to exercise an acceleration clause "he is required to perform some affirmative act evidencing his intention to take advantage of the accelerating provision ...". 635 S.W.2d at 362. See also *Don Anderson Enterprises, Inc., v. Entertainment Enterprises, Inc.*, 589 S.W.2d 70 (Mo.App.1979) where the court also enunciated an affirmative action requirement but went on to distinguish acceleration for default of payments as opposed to acceleration where the holder does so "at will" or where he believes himself to be insecure. 589 S.W.2d at 73. The clear suggestion is that the holder has to set out the grounds upon which he relies to justify an acceleration.

The notice delivered on May 9, 1977 and the testimony offered at the 1977 hearing demonstrates clearly that Lipscomb's attempt to accelerate was based upon an alleged default in payment and upon no other ground. While language in the "Notice of Foreclosure" is broader it can be fairly read as simply detailing the remedies Lipscomb intended to utilize because of the default in payment. The reference to other documents does not enlarge the grounds for declaring a default or accelerating because nonpayment as a ground is set out in those documents.

The evidence in subsequent hearings shows that Lipscomb was concerned about the state of his collateral. Guided by the order on remand he attempted to give that concern more prominence as part of the rationale for acceleration. But the evidence belies that emphasis.

On several occasions prior to May of 1977, Lipscomb says he was troubled by

the performance of PFA and Aggieville. But he did not declare an acceleration or default on any of these occasions. Rather, he acted in a proprietary fashion by resuming active control of Aggieville in January of 1977 and remaining in control until early in May when he was dispossessed for a few days. Not only did he take control of the business, he also took control of the bank accounts and check book, paying the Aggieville bills, dealing with Aggieville creditors and customers and denying PFA any access to Aggieville funds. Transcript November 22, 1982, p. 52. He resumed control on May 10, 1977 and continued when the receiver was appointed after the bankruptcy was filed.

After the 1977 hearing the bankruptcy court denied relief on the ground that Lipscomb had waived timely payments. This finding was sustained on appeal. It must also be noted that from January until May of 1977 Lipscomb was making the note payments to himself and the related note holders from Aggieville funds. Reliance, therefore, upon lateness of payments as a basis for a declaration of default would certainly be suspect as lacking good faith.

In addition to the testimony there is another ground which weighs against the Court finding any validity to the argument that Lipscomb's feelings of insecurity supported his May 9, 1977 notices. As a result of the 1977 hearing, the bankruptcy court found, and this finding was not disturbed on appeal, that reclamation should be denied because Lipscomb had possession of the property sought to be reclaimed. The evidence conclusively shows that Lipscomb had never conveyed any of the property he was obligated to deed to PFA. About the only thing that could be threatened by a blanket injunction obtained by the SEC would have been the Aggieville business which the PFA officers and attorneys were striving to keep from being involved. It is also clear that the SEC had little interest in closing Aggieville as contrasted to its interest in stopping sales of "Estate Builders". Certainly on May 9, 1977, Lipscomb had little reason to believe that his collateral was in much danger for he had ownership

of most of it and was, to use the words of counsel, secured by belt and suspenders, as to the rest.

Reference to Section 400.9–501(1) of the Uniform Commercial Code, R.S.Mo.1969, does not enhance Lipscomb's position here. That section simply provides that upon default "a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement". The limitations contained in subsection (3) relate to the secured party's rights to deal with the collateral but do not reach the question of the secured party's obligations to perform further. The remedies set out in Section 400.9–501 include reducing a claim to judgment, foreclosure and resort to judicial enforcement. The deeds of trust contain the usual foreclosure powers. The security agreements do not contain language excusing the secured party from further performance.

██ The Court finds, therefore, no grounds for the declaration of forfeiture in the language as contained in the various agreements as discussed herein to this point. The evidence shows that Lipscomb relied upon nonpayment. The evidence of conduct does not support another conclusion. This is not to say, however, that Lipscomb would not have been entitled to declare a default eventually, under the circumstances of this matter, but such a declaration would only permit him to begin to seek repossession through further proceedings utilizing the remedies made available by law or in the instruments. This declaration when made would not excuse performance.

## V

The fourth series of events described as defaults include "dissolution, ... insolvency, business failure, appointment of a receiver ... or the commencement of any proceeding under any bankruptcy or insolvency laws by ... Debtor ..." These events are closely related to the issue raised by the District Court concerning in-

solvency as a defense to further performance and so the evidence in this regard will be examined as a whole.

Some aspects of this issue, however, can be dismissed at the outset. On May 9, 1977, the critical date, there was no commencement of any proceeding under any bankruptcy or insolvency laws. That action did not take place until May 13, 1977. Similarly there was no appointment of a receiver or a dissolution. A declaration of default, therefore, could not be based upon those specific grounds.

■ There remains, however, the possibility of a declaration of default based upon "insolvency [or] business failure". But the remedies available upon such a declaration, as a matter of agreement or under the Uniform Commercial Code, do not include the excusing of future performance. Such an obligation is only excused under certain narrow circumstances described by court decisions in Missouri. To determine whether a default existed or whether future performance is excused, this Court must determine whether there was business failure or insolvency as a matter of Missouri law.

"Insolvency, whether of a corporation or a natural person, means inability to pay debts as they become due in the ordinary course of business". *Bushman v. Bushman*, 279 S.W. 122, 126 (Mo.1925).

See also *Adams v. Richardson*, 337 S.W.2d 911 (Mo.1960).

In *Bushman*, supra, the issue was whether a receiver should be appointed. The court did not analyze the defendant's daily expenses but looked to the whole asset picture. The court noted that defendant had a substantial equity in real estate and in her mother's estate. The court found that defendant's assets far exceeded her liabilities and that she was solvent. The court did not discuss whether defendant was paying her bills. Similarly in *Adams*, supra, the court noted that defendant was in default on his child support payments and that the transfer stripped defendant "of his ability to pay his debts". 337 S.W.2d at 917. Again the court did not discuss the paying of bills.

In *Woodbury v. Pickering Lumber Co.*, 10 F.Supp. 761 (W.D.Mo.1933) the court reviewed the establishment of a wholly owned subsidiary in the context of an allegation of fraudulent transfer. The court initially found "that notwithstanding the large excess of assets over liabilities the company was unable to meet its current obligations without a rehabilitation of its credit stature." 10 F.Supp. at 763. The court noted, however, that current bills payable could have been paid out of existing assets, and "that practically the sole object of the subsidiary corporation was to arrange for the satisfaction in some way of the short-time loans made by the banks". 10 F.Supp. at 764. The court noted that creation of the subsidiary worsened the condition of the parent corporation because of the diminution of assets and improved the status of a few creditors. The court found that the corporation was commercially insolvent even though it could pay its current bills and the creation of the subsidiary was a fraudulent transaction.

The case was appealed. *Commerce Trust v. Woodbury*, 77 F.2d 478 (8th Cir. 1935). The court noted that the corporation was not insolvent as a matter of bankruptcy law, 77 F.2d at 480, but that it had credit problems with its banks. Many of its short term debts were due or were shortly to come due and it had accounts payable, some past due, of $440,000. The court went on to discuss the question of insolvency.

"One is insolvent for the purposes of a creditor's bill ... to appoint a receiver ... when he is unable to pay his obligations as they mature; likewise this is the test which warrants the vendor in refusing to deliver goods on a continuing contract, and in exercising the right of stoppage in transitu". 77 F.2d at 488.

The court went on to point out that the test of insolvency as it applied to a fraudulent transfer was not the inability to pay debts as they came due but rather the test expressed "in the Bankruptcy Act of 1898 [which is] whenever the aggregate of his property ... shall not, at a fair valuation,

be sufficient in amount to pay his debts". 77 F.2d at 489. The court reversed the finding of insolvency but agreed that the subsidiary was not a separate entity.

■■■ It is clear here, because this is not an example of a fraudulent transfer, that the test is whether the debtor could pay its obligations as they became due in the ordinary course of business. A balance sheet test is not the proper standard. The party seeking reclamation has the burden of proof on the question of insolvency.

The accountant who prepared portions of debtor's annual report, issued March 31, 1977, was called as a witness. The balance sheet showed stockholder equity while the statement of operations showed a loss of $1,325,210 and a decrease in working capital of $347,423. Lipscomb Ex. 27. In that report the accountant issued a qualified letter stating that as to—

> "the issuance of certain long-term unsecured debt, the Company has recorded a portion of the proceeds as revenues and also deferred a portion of the issuance cost. This treatment, in our opinion, does not comply with generally accepted accounting principles ..."

The letter went on to state that because of this treatment, "the financial statements referred to above do not present fairly the financial position of Progressive Farmers Association at May 31, 1976 ..."

In his testimony the accountant testified that the dispute was over recognition of certain future obligations. Transcript December 3, 1982, pp. 10–12. He also testified that a qualified letter was an unusual event because the accountant would usually be fired before the audit was completed where such a basic disagreement as to treatment existed. Transcript December 3, 1982, p. 33. This particular testimony explaining why qualified opinion letters are rare came in as part of an offer of proof which was rejected but the specific statement is used here as illustrative and not probative in any issue. It merely sets the tone of what was happening in the last year of PFA's existence.

The accountant was of the professional opinion that PFA was solvent by a balance sheet test on May 31, 1976, the formal date of the audit, because of the values contained in the various reports. Transcript December 3, 1982, p. 65. His personal opinion, because of misgivings as to some valuations, was different. Transcript December 3, 1982, p. 66. He testified that there would have been no change through December 3, 1976 to debtor's financial condition. Transcript December 3, 1976, p. 68. He also testified that if insolvency was defined as "the inability to pay debts as they come due in the ordinary course of business" then PFA was solvent on May 31, 1976, through the summer and probably into December of 1976. Transcript December 3, 1982, pp. 68–69. The accountant further stated that he had no opinion as to debtor's ability to pay its debts in May of 1977. Transcript December 3, 1982, p. 79.

David Gamble worked for debtor with responsibility for the accounting records. He was employed from January of 1976 through the early part of May of 1977 and quit a few days before the bankruptcy was filed. He was called as a witness for Lipscomb. He testified that he consolidated the ledgers for the various operations, commenting that Aggieville kept its own general ledger. Transcript December 2, 1982, p. 8.

On May 6, 1977, Gamble's last day of employment, he was of the opinion that PFA had about $30,000 in the various bank accounts which it maintained, excluding the Aggieville account. Transcript December 2, 1982, p. 18. He testified that the various entities paid their own bills from their own accounts. Transcript December 2, 1982, p. 19. He admitted that on occasion, although rarely, checks were held because of cash flow problems. Transcript December 2, 1982, pp. 21, 23.

Gamble testified that on May 6, 1977, the tire centers were closed and that the payables at the two locations were higher than their cash available. Transcript December 2, 1982, p. 24. But there is no evidence that all those payables were due on May 6,

1977. Gamble also testified that as of February 28, 1977, based upon profit and loss statements provided by Aggieville, the Aggieville division was not profitable. The loss was $511,000. But that loss included an intra-company payable, owing to PFA of $637,861.24, which clearly illustrates that Aggieville, setting aside the intra-company payable because it was never paid, Transcript December 2, 1982, pp. 35–36, had a positive cash flow during this period in 1977. Transcript December 2, 1982, pp. 28–33, 37–39. Gamble testified that the condition would not have changed much from February 28, 1977 through May 6, 1977. Transcript December 2, 1982, pp. 29–30. Debtor used its funds to pay some Aggieville expenses, such as payroll. Transcript December 2, 1982, p. 33.

When Gamble left PFA on May 6, 1977, there were bills yet to be paid. He said they might not have been paid because of cash flow considerations. He recalled no particular obligation except for payroll taxes of some $18,000. Transcript December 2, 1982, pp. 59–61. His best recollection was that the various notes were all current when he left. Gamble went on to testify that the taxes could have been paid on May 6, 1977 because there was money available. He was unable to say conclusively why they were not paid. Transcript November 10, 1983, pp. 6, 34–35. Although Gamble testified that he was of the opinion that debtor was insolvent on May 6, 1977, it is apparent that he is thinking of insolvency in the general sense and not in terms of the debtor being able to pay its bills as they come due.

"... I based my opinion on two major reasons. The FMA organization going bankrupt which ... at that time ... was a considerable asset on the PFA books, one of the major assets, as a matter of fact ... plus Wes Chase telling me ... [h]e was of the opinion that things were going to get bad. So, considering both things, I think on May the 6th ... that PFA was insolvent. Other than that, I don't really know what you're asking me". Transcript November 10, 1983, p. 21.

It is apparent that the witness is describing balance sheet insolvency here. He did testify that all the accounts payable were not current on May 6, 1977, Transcript November 10, 1983, p. 21, but the only specific account he referred to as unpaid on that day was the withholding tax obligation. He denied basing his opinion of insolvency on the status of the accounts payable. Transcript November 10, 1983, p. 22.

Gamble admitted that he was not certain on May 6, 1977, whether the cash on hand would have paid all the payables on that day. He was also not aware of what cash was on hand in the Aggieville account or how that would impact debtor's cash flow. Transcript November 10, 1983, p. 36. Lipscomb, however, testified that Aggieville was overdrawn around that particular time. Transcript November 22, 1982, p. 114–115. Gamble also testified, despite his opinion as to debtor's financial condition on May 6, 1977, that it would not have had to close on that day and he could not predict what day in the future it might close. Transcript November 10, 1983, p. 40. He also testified with some reservation because he could no longer remember the exact figures that PFA probably could have paid those accounts due on May 6 and 9, 1977. Transcript November 10, 1983, pp. 49–51, 77.

Gamble went on to state that he had never calculated all of the accounts due on May 9, 1977, and all of the cash available to pay them. Transcript November 10, 1977, p. 54. The general thrust of Gamble's testimony was that debtor had cash flow problems in 1977 but that it was able to keep operating.

Two bank officers testified that on or about May 9, 1977, debtor had about $34,500 in the two banks, Empire and Centerre, and there were no insufficient funds checks shown on the record. Beverly Campbell worked for Gamble from the latter part of 1976 until the debtor stopped doing business. He told her what checks to write. Transcript November 9, 1983, III p. 7. She

recalls no complaints in May about unpaid bills. Transcript November 9, 1983, III pp. 9–10. She testified that there was not enough money in May to pay expenses, Transcript November 9, 1983, III p. 14, but admitted, on cross-examination that she managed only one bank account and was not familiar with the whole financial picture of debtor. Transcript November 9, 1983, III pp. 16–17. She also testified that the payables showed constant carryover but that there were no Aggieville payables on her books. Transcript November 9, 1983, III p. 23.

Wes Chase, an officer of debtor, also testified as to the financial status of debtor in 1977. He and Gamble would decide what accounts to pay and would prioritize the bills. Transcript November 9, 1983 I, pp. 7–8. He admitted there were occasions when funds were insufficient and that a phone bill and some taxes were overdue. Transcript November 9, 1983 I, pp. 8–10. He testified that debtor owed more than could be paid on May 9, 1977 and that debtor was not current on notes to O'Byrne Electric and Larry Robinson (a single obligation) and to Mercantile Bank. Transcript November 9, 1983 I, pp. 16–17. The Robinson note was extended in December of 1976. There is also no evidence that a demand had been made on whatever obligation was due to Mercantile Bank of the amount due the Bank on May 9, 1977.

Percival kept the general ledger for Aggieville in 1977 and before. After Lipscomb took over the business in January of 1977, Percival began issuing checks for Aggieville payables. Transcript December 2, 1982, p. 42. He and Lipscomb decided when payments were to be made, Transcript December 2, 1982, p. 108 and which customers would get credit. Transcript December 2, 1982, p. 91. He also testified that all the Aggieville trade payables were current on May 9 and May 13, 1977. Transcript December 2, 1982, p. 109.

Lipscomb testified that a precipitating cause for his declaration of default was debtor's refusal to pay him anything on the twine note, executed November 10, 1976 and secured by the inventory which was purchased. Lipscomb testified that the twine was purchased by his companies before their sale to debtor and he just assigned the contract. The note came due on February 25, 1977 and Lipscomb asked for payment.

"Q. When did you request payment on that note?

"A. February 25, 1977 or/and the day following that date.

"Q. And do you remember who you talked to about that note?

"A. Mr. Gamble initially.

. . . . .

"Q. What did you ask him?

"A. I asked him for payment of it. It was a demand note and asked for payment of the note at that time.

"Q. What was his response?

"A. His response was that he did not have the money to pay it.

. . . . .

"Q. Who else did you talk with concerning payment of this note?

"A. I talked to the board . . . and to Mr. Wes Chase.

. . . . .

"Q. What was his response?

"A. He did not have the money to pay it.

"Q. When did that response occur?

"A. . . . Sometime after the 25th of February 1977.

"Q. . . . are we talking about as late as May of '77?

"A. It was an ongoing request. I was with them constantly to get the payment on the note . . ."

Transcript November 22, 1982, pp. 50–51.

Lipscomb testified that he received no payment on the note. He also testified that he cannot recall if he extended the note after February 25, 1977.

"Q. . . . as a result of these conversations . . . did you extend the time for payment of the twine note?

"A. I can answer it best by saying I did not make a written demand and take foreclosure procedures prior to May 9th ..."

Transcript November 22, 1982, p. 235.

As drawn the note is not a demand note until after it matures on February 25, 1977. See Lipscomb Ex. 7. The note also contemplates extension beyond that date. "This note to bear interest only if not paid at maturity ... the time may be extended without notice thereof. If not paid when due, the undersigned agree to pay all costs of collection ...". Lipscomb's testimony as to the status of this note after February 25, 1977 is not credible. He could not remember if the term was extended yet he took no action to collect. In other instances when PFA notes were due, Lipscomb paid them out of Aggieville funds. This note was secured, apparently adequately. The Court finds that Lipscomb has failed to prove that the twine note was due in the ordinary course of business on or before May 9, 1977.

Debtor, together with PFA Farmers Market Association, was a maker of notes to Associated Wholesale Grocers, Inc., hereinafter AG. The face amount of the notes exceeded two million dollars and the notes were secured by real estate, inventory, furniture and fixtures owned by the Market. In February and April of 1977, AG wrote debtor and the Market demanding that the levels of collateral be maintained and threatened to accelerate the notes if the demand was not met. On April 16, 1977, AG declared the notes to be in default. The notes provided for cure of default within 72 hours of notice of default. There was no cure and AG declared the debts due and owing by letter dated April 21, 1977. The amount alleged to be due was $884,732.13. Baska deposition Ex. 5.

At the time the April 21, 1977 letter was mailed, Farmers Market had filed a Chapter XI bankruptcy case. Baska deposition January 21, 1983, p. 60. There had been payments on the notes and on the open account between the dates of the first and last letters, Baska deposition January 21, 1983, p. 64, but no payments after April 15, 1977. The evidence shows that the notes were collateralized and there was a guarantee. Baska deposition January 21, 1983, pp. 61–63 and see security agreement dated November 3, 1975 and amendment dated June 22, 1976. The evidence shows that no one could determine the precise amount due on the notes as of May 9, 1977. It clearly would not have been the amount of the demand because, at the very least, of the offset of the value of the collateral which would be foreclosed. Baska deposition January 21, 1983, p. 62.

Baska testified that there had been no response to his various demand letters. Baska deposition January 21, 1983, pp. 38–39. In view of the SEC investigation and the bankruptcy filing of Farmers Market, the Court finds no significance to the fact that there was no vigorous denial of liability or amount due. There were ongoing discussions of the problems. The only point of dispute would be the amount due and that was not likely to be resolved for a substantial period of time. The Court does not find that debtor's failure to contest the contents of the various AG letters of April 1977 is an admission as to the precise amount of liability.

In *Commerce Trust Co. v. Woodbury,* supra, the question ultimately resolved by the court was whether a receiver could take charge of the business activities of a subsidiary corporation where only the parent corporation was the subject of the action. The court found debtor to be solvent as a matter of balance sheet analysis. 77 F.2d at 480. But the court went on to note that there were substantial matured obligations on the long term debt, the case having been filed in May of 1931 and the obligations maturing in 1930 and "[i]n addition to the above there were accounts payable, many of which were past due, approximately $440,000." 77 F.2d at 481. The court concluded that the parent corporation was not insolvent, as the trial court found, because there were sufficient assets to pay the accounts payable, 77 F.2d at 490, and because a judgment creditor would have

been able to satisfy its execution. The court makes a distinction between accounts payable and long term debt obligation. See also *Carson v. Long-Bell Lumber Corporation*, 73 F.2d 397 (8th Cir.1934).

 Some comparison can be made with cases arising under bankruptcy laws dealing with the initiation of involuntary cases where the standard the evidence must meet is a finding that the alleged debtor is not paying debts as they come due. Section 303 of the Code, Title 11, U.S.C. Historically, as embodied in 1984 amendments to Section 303(b)(1), a debt is excluded from consideration if there is a bona fide dispute as to liability. *In re North County Chrysler Plymouth, Inc.*, 13 B.R. 393, 7 B.C.D. 1409, 4 C.B.C.2d 1533 (Bkrtcy.W.D.Mo.1981); *Harris v. Capehart-Farnsworth Corporation*, 225 F.2d 268 (8th Cir.1955).

 Equally important, the question of whether a debtor is not paying his debts as they generally come due is a matter that must be determined in the context of a particular entity and not by any broad standard. *In re Galanis*, 20 B.R. 590 (Bkrtcy. Conn.1982); *In re R.N. Salem Corp.*, 29 B.R. 424 (S.D.Ohio 1983); *In re Einhorn*, 29 B.R. 966 (Bkrtcy.E.D.N.Y.1983). Missouri courts regularly look to cases in bankruptcy for the determination of such standards. *Commerce Trust Co. v. Woodbury*, supra, 77 F.2d at 489.

> "[T]he court believes that generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will be significant will be fewer than where the debtor has a large number of creditors. Also, the amount of the debts not being paid is important. If the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper". *In re All Media Properties, Inc.*, 5 B.R. 126, 143 (Bkrtcy.S.D.Tex.1980), quoted with

approval in *In re Salem Corp.*, supra, at 432.

Courts have also held "that evidence which indicates amounts owed by a debtor but which does not indicate when the amounts are actually payable, is insufficient to prove the debtor is not meeting its debts". *In re Einhorn*, supra, 29 B.R. at 969. See also *Matter of B.D. Intern. Discount Corp.*, 15 B.R. 755 (Bkrtcy.S.D.N.Y. 1981).

What the evidence shows here is that in 1977 and perhaps before, debtor had cash flow problems which caused it to pay its ongoing accounts in an erratic fashion. That was certainly the situation in late April and early May of 1977. That evidence compels the Court then to look more closely at allegations and evidence of non-payment in order to determine whether there exists general inability or merely continuation of previous practices.

There is a great deal of testimony that debtor owed bills on May 9, 1977, which it could not pay. But that testimony is general. It does not enable the Court to identify those bills which had been booked and were due as opposed to those which merely had been received and were not yet due.

The temptation here is to analyze debtor's position as if the test were balance sheet insolvency. The evidence suggesting that debtor was in dire financial condition on May 9, 1977 is plentiful. But balance sheet insolvency is not the test and the Court must look hard at the evidence to determine that the proper test be applied and satisfied.

On May 9, 1977, debtor was not active in its various businesses. The tire center stores had been closed in the prior few days. Estate Builder sales apparently were continuing but generated few costs. Aggieville was operating but was current on its payables. Debtor had few employees. So far as the evidence shows its major obligations were long term debts. Its payables for services, utilities, taxes and salaries were nominal. In addition to cash in banks, debtor had Estate Builder funds

of an unknown amount on hand. Lipscomb argues those funds were not available to pay bills. What the evidence shows is, that because of the SEC investigation, debtor chose not to use those funds. They were available, although the amount is not in evidence, it is easily ascertainable, and must be considered in determining whether debtor had the ability to pay its debts as they came due. In addition, it had about a quarter of a million dollars in accounts receivable at Aggieville, which, according to Lipscomb, were 90% collectible, Transcript November 22, 1982 pp. 176–182, against which debtor owed Lipscomb only about $101,000.

Because Lipscomb ran Aggieville for debtor in 1977 through May 6, it is easy to view it as separate from debtor. It was not and it is important to consider Aggieville assets as available to debtor to make payments. Therefore on May 9, 1977 debtor had quick assets in excess of cash on hand out of which it could have paid accounts due.

The evidence shows two bills, for printing and telephone, past due for small amounts. It shows some taxes past due. The evidence shows Aggieville current on its trade payables. The Court has previously concluded that the assertion the twine note was past due is not credible. On long term obligations owed the Lipscomb interests, the court on appeal has held that the creditors had waived timely payments. Those installments then were not necessarily due on May 9, 1977. The Court further finds that debtor had assets available to pay the installments on the AG notes that were due through May 9, 1977. These amounts were rather nominal. See the promissory note attached as exhibit to the Baska deposition. In addition, this Court finds that those long term debts and the notes owed AG were not the type of obligation that courts would look to in trying to determine if a debtor were paying its bills as they came due in the ordinary course of business. Courts clearly distinguish between trade payables and long term debt when considering the solvency of a debtor. See, for example, *Commerce Bank Co. v. Woodbury*, supra, and *In re R.N. Salem Corp.*, supra. The rationale for this is clear. Reorganization often involves the restructuring of long term debt, but an inability to pay both long term debt and trade payables tends to be fatal. The Court does not suggest that an inability to pay installments on long term debt is to be ignored but only that such evidence must be held in perspective.

██ The evidence here does not show that debtor was not paying its bills as they came due in the ordinary course of its business. What definitive evidence there is shows that debtor in May of 1977 was continuing its erratic pattern of paying bills but that it had sufficient assets, including cash, to meet the ordinary business obligations which the evidence shows to have been due. The Court finds that debtor was solvent as a matter of Missouri law on May 9, 1977.

In accordance then with the directions of the District Court this Court holds that Lipscomb was not excused from future performance on May 9, 1977 and the trustee is entitled to rescind. This Court further holds, consistent with that part of Judge Jones' opinion not set aside on appeal, that the trustee is entitled to recover the sum of $458,825.10 from the various plaintiffs, jointly and severally. *Cannon v. Bingman*, 383 S.W.2d 169 (Mo.App.1964).

### APPENDIX

The evidence shows, and Judge Jones so found that Lipscomb and related entities never conveyed the real estate which they agreed to sell to debtor. He therefore denied reclamation. That finding and holding was not disturbed on appeal.

Despite Lipscomb's failure to convey, debtor made the downpayments and executed the various notes called for in the sales agreements. Debtor also began to pay the installments required by those notes and was current through April of 1977. Execution of the notes and payments thereon evidenced reliance on Lipscomb's representations that he could deliv-

er good title on debtor's part for it had no legal obligation to execute the notes until the property was conveyed. The various agreements provided that the promissory notes were to be "dated as of the date of transfer of the real property provided for herein ...". Since the property was never transferred, the notes could never be dated and it is reasonable to assume therefore, although the Court makes no finding because the issue is not before it, that payments on the real property were never due.

Here Lipscomb breached his obligation to deliver title but appears here to insist that debtor's subsequent failure to perform justifies his "in limine" failure to perform and excuses further performance. That position is not the law in Missouri. "It is elementary that a party to a contract cannot claim its benefit where he is the first to violate it". *Boten v. Brecklein,* 452 S.W.2d 86, 92 (Mo.1970); *Burns v. Beeny,* 427 S.W.2d 772 (Mo.App.1968). To support a recovery for breach, the complaining party must show his own performance or his ability to perform. *Navato v. Sletten,* 560 F.2d 340 (8th Cir.1977) following Missouri law.

This is not to say that ultimately Lipscomb could not foreclose his various security interests. That rests upon questions of default, first, and the trustee's evaluation of whether the property was of value to the estate, second. The question here, however, is whether Lipscomb can sell his property, keep it and still get paid for its as if he had performed.

"It is true that the prospective inability to perform which arises upon the insolvency of one party to a contract does not necessarily excuse the other party from performance ... [citations omitted] ... but it may justify the solvent party in requiring security as a condition to further performance". *First State Bank v. Reorganized Sch. Dist. R–3, Bunker,* 495 S.W.2d 471, 479 (Mo.App.1973).

This is a well settled rule of law in Missouri.

"The law is that ... it is necessary for the party intending to sue for enforce-

ment of the contract ..: [to] ... make a tender of performance ...

"The fact that the other party, by whom money was to be paid, is insolvent ... will not on this ground excuse a tender to him ..." *Cornett v. Best,* 151 Mo.App. 546, 132 S.W. 35, 36 (1910).

See also *H. Muehlstein & Co. v. Hickman,* 26 F.2d 40 (8th Cir.1928) where the court, ruling a case arising in Missouri, held that "[i]nsolvency does not operate to relieve from breach of contract" 26 F.2d at 44, and therefore the party seeking damages must show either performance or an ability to perform.

The general rule of law has been codified, although not for land sales (see 400.2–102 and 400.2–105(1), R.S.Mo.1969 provisions which exclude real estate transactions from coverage under the UCC) in Section 400.2–702(1), R.S.Mo.1969, which provides that:

"Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this article".

Here, of course, this was not a matter of a continuous course of dealing. Lipscomb had an obligation to deliver title at the time the agreements were executed and certainly at the time debtor delivered the cash downpayments and the notes. He was in breach thereafter through May 9, 1977. It does not appear that he could at any point during that period of time perform in accordance with the agreements. See 4 Corbin on Contracts, § 978 at 925.

The leading case in Missouri construing rights arising under Section 400.2–702 is, ironically, *Matter of PFA Farmers Market Ass'n.,* 583 F.2d 992 (8th Cir.1978). That case, however, deals with the rights of the reclaiming creditor, § 400.2–702(2), against the trustee and not the question of whether and under what circumstances a party to a contract may refuse to perform in view of the other party's apparent insolvency. Compare *Indussa Corp. v. Reliable Stain-*

*less Steel Supply Co.*, 369 F.Supp. 976 (E.D.Pa.1974). The clear thrust of cases as *Indussa Corp.* seems to be that a party to a contract requiring continuing performance or prior to any performance may refuse where the other party is insolvent. Here, however, the allegedly insolvent party had made substantial performance while Lipscomb, seller, had not tendered and was unable to tender throughout the period of payments. The facts do not appear to fit within the general run of mercantile cases.

The evidence from the July 19, 1977, hearing shows that Lipscomb recovered, or attempted to recover, in May of 1977, property worth more than he sold.

"Q. ... Are you saying that the real estate that you have today, the three locations is worth more today in a normal way, ... absent your bankruptcy ... than it was seventeen months ago, is that right?

"A. I believe the real estate is worth more than it was seventeen months ago, under these conditions.

Transcript, July 19, 1977, p. 53.

"Q. ... Now wouldn't you say ... in fairness that what you got on May 9th was as good an inventory as you sold on December 5th, 1975, and of $100,000 plus greater value?

"A. I think it would be safe in saying that".

Transcript, July 19, 1977, p. 61.

The state of the record, in light of the opinions handed down by Missouri courts, clearly suggests that Missouri courts, as a matter of first impression, would probably not excuse performance by sellers in this case.